UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHANE DAVID RISJAN, | : | |
| | : | |
| Petitioner | : | CIVIL ACTION NO. 3:15-CV-268 |
| | : | |
| v. | : | (JUDGE MARIANI) |
| | : | (Magistrate Judge Mehalchick) |
| JOHN WETZEL, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

## MEMORANDUM OPINION
## I. INTRODUCTION

Presently before the Court is a Report and Recommendation ("R&R") (Doc. 29) from Magistrate Judge Karoline Mehalchick, in which she recommends Petitioner's 28 U.S.C. § 2254 petition (Doc. 1) be dismissed with prejudice. (Doc. 29 at 22.) The primary issue under consideration is whether Petitioner is entitled to equitable tolling of the one-year statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d). If Petitioner's habeas action is deemed timely filed, the Court must then determine whether he is entitled to substantive relief. For the reasons discussed below, the Court concludes that equitable tolling is appropriately. The Court further concludes that Petitioner's 28 U.S.C. § 2254 Petition (Doc. 1) is properly granted on the limited terms set out herein.

## II. FACTUAL BACKGROUND

Other than the underlying incident summary and references to family correspondence or declarations, the factual background set out below is derived from the Declaration of Petitioner, Shane David Risjan (Doc. 18-1 at 2-7) and exhibits attached thereto (*id.* at 8-25), Respondent's Answer to Petition for Writ of Habeas Corpus (Doc. 22), Respondent's Brief in Opposition to Petition for Writ of Habeas Corpus (Doc. 22-1), and attached exhibits (Doc. 22-2 through 22-11).

On March 11, 2009, Petitioner was convicted of involuntary deviate sexual intercourse, indecent assault, indecent exposure, and corruption of minors after a three-day jury trial in the Dauphin County Court of Common Pleas. (Doc. 22-1 at 2; Doc. 22-2 at 3.) Petitioner's daughter, who was nine-years-old at the time, was the victim of these crimes. Petitioner alleges that his conviction was based on his own coerced confession and the testimony of one witness. (Doc. 43 at 4-5.)

The incident giving rise to his arrest and conviction occurred on January 8, 2008. (Doc. 22-2 at 2.) Petitioner, his seven children, and his grandparents had traveled from Waterford, Pennsylvania, to Hershey, Pennsylvania, to attend the Pennsylvania Farm Show and arrived at the Comfort Inn in Hershey, Pennsylvania, on the evening of January 8th. (Doc. 43-1, Declaration of S. Risjan.) The family was at the hotel pool with Petitioner and several of his children in the water when a woman who was attending a conference at the hotel, Stephanie Haynes, observed the pool area through hallway windows. (Doc. 43 at 5

(citing N.T. at 81, 96-97, 205).)[1]  Ms. Haynes testified that she saw a man in the pool with a young girl on his lap, and "it appeared . . . she was extremely uncomfortable." (*Id.*) According to her testimony, the girl tried to struggle away from Petitioner as he was pulling her through the pool with his hands on her waist. (*Id.* (citing N.T. at 103-04).)  Ms. Haynes reported the activity, which she described as Petitioner having his hands around the girl, to the front desk attendant, Kerri Frolich. (*Id.* at 6 (citing N.T. at 88-89, 107-08).)  She said she reported the conduct because she did not think it was appropriate physical contact between a grown man and a small child. (*Id.* (citing N.T. at 104).)  Ms. Frolich alerted local authorities. (*Id.* at 7 (citing N.T. at 138-39, 141).)  Pursuant to a subsequent radio dispatch which alerted to both a rape in progress and allegations of oral sexual conduct, a police officer and detective arrived at the scene. (*Id.* (citing N.T. at 186, 194, 197).)  After speaking with Ms. Haynes, the detective, Gregory Day, asked Petitioner to accompany him to a conference room where Day questioned Petitioner. (*Id.* (citing N.T. at 165).)  This is where Petitioner asserts that his confession, which followed denials of inappropriate conduct and consisted primarily of one-word answers to questions posed by Day, was coerced by threats that his daughter would be taken away. (*Id.* at 9 (citing N.T. at 306, 378, 383-84, 389, 391-92, 412-13).)  Petitioner's daughter did not testify at the trial and has

---

[1] The trial transcript has not been submitted to the Court. (*See* Doc. 22-1 at 2 n.1.)  In Petitioner's Objections to the Report and Recommendation of the Magistrate Judge (Doc. 43), Petitioner's first counseled submission in this habeas action, citations to the trial transcript are provided in support of the section of the brief titled "Trial Proceedings and Evidence Adduced Therein." (*See* Doc. 43 at 4-13.) Because Respondents did not file a responsive brief, citations to the trial transcript have not been disputed.

continuously denied that any inappropriate conduct occurred. (*See, e.g.*, Doc. 9-1 at 1, Doc. 44 at 8-10.)

As noted above, Petitioner was convicted on March 9, 2009. *See supra* p. 2. He was sentenced on June 29, 2009 by the Honorable Richard A. Lewis to 10-20 years in a state correctional facility for the involuntary deviate sexual intercourse count, 9-24 months concurrent for the indecent assault charge, 3-23 months concurrent for the indecent exposure charge, and 9-24 months for the corruption of minors charge. (Doc. 22-1 at 2.) He was represented by J. Michael Sheldon, Esquire, at trial. (*Id.*) No post-sentence motions were filed, and no direct appeal was filed. (*Id.*)

The roots of this habeas petition are based in the fact that Sheldon did not file post-trial motions or an appeal whereas Petitioner and his grandmother, Clara Risjan, (who was with him at the time of the January 2008 incident, testified at the trial, and communicated with Sheldon about the case) believed that Sheldon continued to represent Petitioner post-sentencing and had filed an appeal. Testimony later adduced at hearings related to Petitioner's first Post-Conviction Relief Act Petition ("PCRA I") filed on May 7, 2012, sheds light on the origin of Sheldon's alleged belief that he was not expected to file an appeal and Petitioner's belief his attorney would file and had filed a timely appeal.

The first PCRA Hearing was held by Judge Lewis on April 19, 2013. (Doc. 22-7 at 8-34.) Petitioner and Sheldon testified at the hearing. (*Id.* at 8.) Anthony A. Logue and

James A. Pitonyak appeared for Petitioner.  (*Id.*)  Jason E. McMurry appeared for the

Commonwealth.  (*Id.*)

Petitioner testified that he told Sheldon he wanted to appeal the verdict when

Sheldon visited him at the Dauphin County Prison at some time after the verdict and before

June 2009.  (Doc. 22-7 at 13 (Tr. at 11:23-12:13).)  Petitioner also instructed his

grandmother to let Sheldon know he wanted to appeal the verdict.  (*Id.* (Tr. at 14-17).)  After

the sentencing on June 29, 2009, Petitioner did not get to see Sheldon but testified that he

told his grandmother to contact Sheldon and tell him to start the appeal and she reported to

him that he had done so.  (*Id.* (Tr. at 13:5-14).)   Petitioner further testified that, based on

this information, he believed Sheldon was handling his appeal.  (*Id.* (Tr. at 13:15-17).)  The

following exchange then occurred between Logue and Petitioner:

> [Logue]"After you told your grandmother to have Attorney Sheldon file your
> appeal, did you have any further communication with him either in person, by
> mail, by telephone, any contact whatsoever?"
>
> [Petitioner] After the sentencing?
>
> [Logue] Yes
>
> [Petitioner] No.

 (*Id.* (Tr. 13:18-25).)

Sheldon testified that he met with the family after the verdict and before sentencing

but he did not remember meeting with Petitioner.  (Doc. 22-7 at 14 (Tr. at 18:7-13).)

Sheldon described his contact with the family after the verdict as follows:

> After the verdict I had been so emotionally involved in the case, I went out into the lobby outside the courtroom and I broke down in tears because I felt badly for Mr. Risjan. I felt badly for the sentence that I knew was coming and I told the family at that point in time that I didn't feel capable, if they were planning to appeal it, to handle any appeal, that they needed a new fresh set of eyes.

(*Id.* (Tr. 18:16-24).) McMurry then stated: "So safe to say, you informed them the day he was convicted that you would not pursue an appeal in this matter on behalf of Mr. Risjan?" (*Id.* (Tr. 18:25-19:2).) Sheldon responded: "Absolutely. I didn't feel confident to do so. I was emotionally just broken down." (*Id.* (Tr. at 19:3-4).)

Sheldon did not recall visiting with Petitioner at the prison between the verdict and sentencing but said "I am not saying that I didn't" (*id.* at 16 (Tr. at 24:2-3)), ""I may or may not have been there" (*id.* (Tr. at 25:12-13)). He did not recall having a conversation with Petitioner during this time about the appeal:

> I don't recall that conversation because I made it clear to the family and if I did meet with Mr. Risjan, I would have made it clear to him that I didn't feel capable of handling the appeal and send him to another attorney.
>
> But I was doing primary conversations with his grandmother. They were the ones talking with me mostly. Those were the people that I probably talked with. I do not remember talking to Mr. Risjan between the date of verdict and date of sentencing.

(Doc. 22-7 at 16 (Tr. at 25:20-26:5).)

Sheldon testified that he did not recall having any conversations with Petitioner or his family after the sentence. (*Id.* (Tr. at 19:17-19).) When asked about receiving correspondence, he stated that Petitioner and his family would send him things "periodically throughout the case, . . . bible quotes." (*Id.* (Tr. at 19:23-25).) He clarified that the time

frame he was referring to was before the trial. (*Id.* at 15 (Tr. at 20:3-4).) When asked if he had ever given the family the impression that he would handle the appeal, Sheldon responded as follows:

> Absolutely at no time did I ever tell them that I would handle the appeal, did I give them that impression. If anything, I specifically told the family on the date of the verdict that I would not be handling the appeal and I recommended another attorney and told them that I would take the file to that attorney personally.

(Doc. 22-7 at 15 (Tr. at 21:1-7).) He identified the other attorney as Bill Costopoulos and added "I made it very clear to Miss Risjan on the day of the verdict that I would not be handling an appeal. That's it." (*Id.* (Tr. at 21:9, 22:1-3).)

On cross-examination by Pitonyak, Sheldon confirmed that he never formally withdrew his representation of Petitioner and never filed a motion to do so. (*Id.* (Tr. at 22:20-23, 23:15-18).) Sheldon did not dispute that his name remained on the docket up until the time that Attorneys Logue and Pitonyak entered their appearance. (*Id.* (Tr. at 23:7-14).) Sheldon testified that his representation ceased after sentencing according to the fee agreement. (*Id.* (Tr. at 23:3-6).) When asked whether he ever visited Petitioner after sentencing to advise him about the necessity of getting an appeal filed and getting someone else to file an appeal, Sheldon responded that he did not remember going to see him. (*Id.* at 15-16 (Tr. at 23:19-24:3).)

Regarding correspondence from Ms. Risjan to Sheldon between the verdict and sentencing, Sheldon first responded that he did not know—he had sent his file to Attorneys

Pitonyak and Logue in August 2011. (*Id.* at 16 (Tr. at 6-14).) Sheldon then addressed a

specific letter in which Ms. Risjan discussed filing an appeal and said he believed she was

asking him to consider remaining on the case. (*Id.* (Tr. at 26: 6-23).) When asked whether

he had responded to the letter in any way indicating that he would not be filing an appeal

and making sure that she had someone representing Petitioner to secure his appellate

rights, Sheldon responded that

> I probably did out of concern for Shane and his appellate rights. I made it clear
> to her on the day of the verdict that she has a limited amount of time after
> sentencing in order to do something, to retain an attorney. If there is a letter
> you have it. You have the entire file.

(Doc. 22-7 at 17 (Tr. at 28:23-29:3).) Sheldon stated that he did not remember follow-up

calls from Ms. Risjan due to a lack of response to the letter. However, he did remember

calls from her on another subject but did not remember when he got those calls because it

was almost four years before the hearing and he "didn't keep records of who called what

hour, what day." (*Id.* (Tr. at 29:8-30:2).)

Regarding phone calls from Ms. Risjan after sentencing, Sheldon said that she had

called asking for the entire file but that was well past any appellate and PCRA time, adding

"[i]n fact, she was calling me to ask me for the entire file, I think for Attorney Logue and I

don't feel comfortable releasing a file to a relative." (*Id.* at 16-17 (Tr. at 27:16-28:1).)

Sheldon concluded that phone calls, or a claim to have made phone calls, would not make

sense because Ms. Risjan's letter asking him to consider remaining on the case indicated

that she knew he did not want to be part of any appellate process.  (*Id.* at 17 (Tr. at 28:9-17).)

One exhibit was entered at the hearing: a letter dated March 20, 2009, from Clara Risjan which Petitioner's counsel had obtained from Sheldon's file.  (Doc. 22-7 at 18 (Tr. at 32:9-23).)

The second PCRA Hearing was held by Judge Lewis on September 6, 2013.  (Doc. 22-7 at 2-7.)  Clara Risjan and Attorneys Logue and Pitonyak appeared by video from Erie. (Doc. 22-7 at 3 (Tr. at 2:8).)  Ms. Risjan testified that, after the verdict, she was in the courthouse lobby when she told Sheldon the family wanted him to appeal the verdict.  (Doc. 22-7 at 3 (Tr. at 4:32-5:22).)  In answer to the question of whether Sheldon ever told her "he didn't feel he was capable of doing the appeal or he wanted a fresh set of eyes to look at this other than him doing the appeal," Ms. Risjan responded that he never told her that.  (*Id.* at 3-4 (Tr. at 5:23-6:6).)   Logue then asked if she had spoken with Sheldon about costs of the appeal and Ms. Risjan said "[t]he only thing that was said about costs at that time was he said it would cost more, that we would have to pay more to have the appeal.  And I said I realize that and that was okay with me."  (*Id.* at 4 (Tr. at 6:4-10).)  Ms. Risjan stated that she did not talk with Sheldon right after the sentencing because he had left "right away," but she talked with him later that day.  (*Id.* (Tr. at 6:20-24).)  She testified that she reached Sheldon on his cell phone and she first asked him what the verdict was, explaining that they were sitting far back in the courtroom and could not hear.  (*Id.* (Tr. at 7:10-12).)  Ms. Risjan said

she then told him they wanted him to take the appeal and Sheldon said that he would go over all of his files and let them know.  (*Id.* (Tr. at 14-20).)   Upon questioning about whether Sheldon had brought up the name of Bill Costopoulos, Ms. Risjan said she had never heard of that name.  (*Id.* (Tr. at 21-24).)  Ms. Risjan testified that she spoke with Sheldon once between the verdict and sentencing at which time he spoke about the unlikely success of an appeal and she told Sheldon it was worth it even if the chance of success were just one percent.  (*Id.* (Tr. at 8:12-9:3).)  She confirmed that Sheldon never told them he would not be handling the appeal and she expected to hear from him about a bill but did not.  (*Id.* (Tr. at 8:6-10).)  When asked when she discovered that Sheldon was not working on Petitioner's appeal, Ms. Risjan answered as follows:

> Well, it was probably about a year later.  I still hadn't received a bill from him.
> So I hadn't paid him any money because he never told me the amount and he
> never told me that, no, he wouldn't take it.  So I believed that he was working
> on the case.  I believed that he was doing the appeal.

(Doc. 22-7 at 4 (Tr. at 9:7-13).)  Ms. Risjan confirmed that she was shocked when she found out that nobody was working on an appeal, adding that she had never been involved in anything like it so she didn't know how long it took and she believed he was doing it until she didn't hear from him and didn't answer her letter at which point she thought they better look for another attorney.  (*Id.* (Tr. at 9:14-24).)

On cross-examination, the attorney for the Commonwealth, Andrew Jarbola, asked Ms. Risjan about the March 20, 2009, letter discussed at the previous hearing and entered into evidence where she said "I don't understand why you can't be or don't want to be our

attorney for the appeal because you already know this case and I can't believe you can't [sic] just forget about an innocent man." (*Id.* (Tr. at 11:17-21).) Ms. Risjan testified that she did not remember everything she put in that letter, adding "I know I would have asked him about doing the appeal and if he would let us know." (*Id.* (Tr. at 11:23-12:1).) Jarbola then asked whether Sheldon had told her on the day of the verdict that "he was incapable of handling an appeal because of his emotional involvement in the case and how hard he had tried and what he was going to do is try to find another attorney that could handle it? Did he tell you that?" (*Id.* (Tr. at 13:2-8).) Because Ms. Risjan was unable to hear Jarbola, Pitonyak repeated the question, asking whether Sheldon told her on the date of the verdict "that he didn't feel comfortable handling an appeal because he was too emotionally involved in the case." (*Id.* (Tr. at 13:11-17).) She responded as follows:

> No, he never even mentioned anything about emotionally involved to me. He said that he would need some time to think it over and like a couple of days or something and go back over, go back over his file. But he never told me he wouldn't do it or he didn't say no or anything like that. He didn't say, no, I won't handle it.

(*Id.* (Tr. at 13:18-25).)

In Petitioner's Declaration dated May 21, 2015, he stated that he verbally requested Sheldon to file an appeal and about two weeks after sentencing he sent him a letter requesting to know the issues he planned on raising and asked Sheldon to contact Petitioner's grandmother to work out the necessary arrangements. (Doc. 18-1 at 2 ¶¶ 4, 5.) In September 2009 Petitioner contacted the Dauphin County Clerk of Court to inquire about

the status of his case because he had not heard back from Sheldon and he had not returned telephone messages left by his grandmother. (*Id.* ¶ 6.) In correspondence dated November 3, 2009, the Clerk of the Court for Dauphin County responded to Petitioner's correspondence and advised him that his request could not be accommodated because:

> Requests for information/copies must come from your attorney of record.
>
> Your motion/request has been sent to your attorney of record as per rule 576(A)(4).
>
> This office does not have or is unable to accommodate your request.
>
> Comments: Pursuant to the Pennsylvania Rules of Appellate Procedure, once an appeal is filed, all records are transmitted to the Pennsylvania Superior Court. Any questions you have concerning your case should be addressed to your attorney of record, J. Michael Sheldon, Esq.

(Doc. 18-1 at 9 (emphasis in original).)

Petitioner states that he sent Sheldon two separate letters as a result of the Dauphin County Clerk's correspondence and in both the November and December 2009 letters he inquired about the status of his appeal and the reasons why Sheldon had not communicated with him or his grandmother. (Doc. 18-1 at 3 ¶ 8.) Sheldon responded with correspondence dated February 8, 2010. (Doc. 18-1 at 11.) The body of the correspondence states, in total: "In response to your letters dated November 10, 2010, [sic] and December 14, 2010, [sic] you should refrain from communicating directly with the courts. As your attorney of record, all questions you have concerning your case should be forwarded directly to me." (*Id.*)

Regarding the period following receipt of Sheldon's letter, Petitioner makes the following assertions:

> [b]elieving that Attorney Sheldon was, in fact, working on my appeal, in March, April and May of 2010, I again wrote Attorney Sheldon and requested to know the status of my appeal.
>
> . . . In June, 2010, after receiving no response from Attorney Sheldon, I requested my grandmother to contact Attorney Sheldon directly, inquire as to the status of my appeal, and obtain a copy of the appeal papers Attorney Sheldon filed on my behalf.
>
> . . . In July, 2010, after learning from my grandmother that Attorney Sheldon would not provide her with any file material relating to my case, I again wrote Attorney Sheldon and requested that he provide the appeal papers he filed on my behalf directly to me.
>
> . . . In September, 2010, after receiving no response from Attorney Sheldon, I wrote to the Pennsylvania Superior Court, explained the difficulties I was experiencing in communicating with Attorney Sheldon. I also requested that I be provided with a copy of the appeal papers Attorney Sheldon had filed on my behalf.

(Doc. 18-1 at 3-4 ¶¶ 10-13.) The Superior Court provided a written response dated October 5, 2010, which stated the following:

> This office is in receipt of your correspondence of September 13, 2010, in which you request a copy of documents filed on your behalf by your attorney, J. Michael Sheldon, Esq.
>
> Any request for a copy of appellate briefs filed on your behalf should be made directly to Attorney Sheldon.

(Doc. 18-1 at 13.) Sheldon was copied on the letter. (*Id.*)

Petitioner says that, upon receipt of the letter from the Superior Court's Prothonotary's Office, he immediately contacted Sheldon in writing "demanding"

that Petitioner be advised of the status of his appeal, provide him or his grandmother with a copy of the brief filed on his behalf, and, if Sheldon was not going to do this, "he should do whatever he needed to do to have a new attorney take over [the] case." (Doc. 18-1 at 4 ¶ 15.) On December 12, 2010, Sheldon wrote to Petitioner:

> Dear Shane:
>
> As I stated in previous correspondences, you should refrain from communicating directly with the courts concerning your case. Any questions you have should be sent to me.
>
> If it is your desire to retain new counsel to take over your case, you should instruct new counsel to contact me to arrange retrieval of you file.

(Doc. 18-1 at 15.)

Petitioner states that he was unsure how to proceed after receiving this letter and, from January through March 2011, he attempted to contact a number of attorneys to take over his case. (*Id.* at 4 ¶ 17.) Having been unsuccessful, in April 2011 Petitioner asked his grandmother to see if she could find someone. (*Id.* ¶ 18.) Petitioner states that "[i]n May, 2011, upon learning from my grandmother that Attorney Sheldon failed to file an appeal on my behalf, I authorized my grandmother to retain the services of private counsel, Anthony Logue and James Pitonyak." (*Id.* ¶ 19.)

On cross-examination at the first PCRA hearing, McMurry asked Petitioner when he learned that no appeal had been filed on his behalf. (Doc. 22-7 at 13 (Tr. at 14:12-13).) The following exchange then occurred:

[Petitioner] When a letter was sent back to, I believe it was my grandmother from Mr. Sheldon stating that he did not want to handle it and gave names of a couple other guys in that area.

[McMurry] Mr. Sheldon told you or told your grandmother that he did not want to do the appeal?

[Petitioner] Yes.

[McMurry] Do you recall when that was?

[Petitioner] No. No, sir, I don't.

[McMurry] Can you give me an approximation on it, 30 days after you were sentenced, 45, month, two months?

[Petitioner] Not really.

[McMurry] What did you do after you learned that Mr. Sheldon did not want to appeal your case?

[Petitioner] I instructed my grandparents to try to find somebody else to take it.

[McMurry] When did that occur? Do you recall a time frame on that?

[Petitioner] I am going to say late 2010, early '11.

[McMurry] When did you retain Mr. Logue's services?

[Logue] I can answer that. I think we entered an appearance in August of 2011. That's probably part of the record.

[McMurry] So what efforts did you make to appeal your case before 2010, 2011?

[Petitioner] It was through my grandparents contacting an attorney.

[McMurry] Did your grandparents contact another attorney?

[Petitioner] Yes, they did. They did contact another one and were denied.

[McMurry] What do you mean by denied?

[Petitioner] He did not want to take the case.

[McMurry] Do you know who that was?

[Petitioner] I believe it was Ridge.

[McMurry] Do you know when that was?

[Petitioner] Probably March, April of 2011.

(Doc. 22-7 at 13-14 (Tr. 14:14-16:5).)

On May 2, 2011, Ms. Risjan signed a Fee Agreement in which she retained Attorneys Logue and Pitonyak (with Petitioner's permission) to provide representation with respect to the "Criminal Appeal for Shane David Risjan" for the sum of $30,000. (Doc. 18-1 at 5 ¶ 19; 17.) Petitioner said that they were retained "for the exclusive purpose of filing a state court PCRA petition, seeking reinstatement of . . . state court appellate rights." (*Id.* ¶ 20.) Petitioner further avers that Logue and Pitonyak represented to him that a PCRA petition "would and had been filed within 60 days of learning that his trial counsel, Attorney Sheldon, had failed to file requested state court appeal on his behalf." (*Id.* ¶ 21.)

On May 7, 2012, Petitioner's attorneys filed "Petition Pursuant to Post-Conviction Relief Act/Motion for Post-Conviction Collateral Relief/Motion for Writ of Habeas Corpus" ("PCRA I"). (Doc. 22-4.) The filing included five claims of ineffective assistance of trial counsel (Doc. 22-4 at 4-8), one of which contains six subparts (*id.* at 8). It also included a request for habeas corpus consideration based on the same facts as the ineffective

assistance of counsel claims.  (*Id.* at 9.)   In the Relief Requested section of the filing,

Petitioner stated the following:

> Due to ineffective assistance of trial counsel, Defendant would respectfully request that this Honorable Court reinstate Defendant's post-sentencing and appellate rights, grant him a new trial, or, hold an Evidentiary Hearing pursuant to the PCRA Petition; or in the alternative, grant him a hearing relative to his Motion for Writ of Habeas Corpus.

(Doc. 22-4 at 10.)  The Petition did not discuss the filing requirements for a PCRA petition

found in 42 Pa. C.S.A. § 9545(b) nor did the petition seek an exception to the normal

requirement that the petition be filed within one year of the date the judgment becomes final

as set out in § 9545(b)(1)(i)-(iii).

On June 17, 2014, Judge Lewis issued his Memorandum Opinion and Final Order

addressing the May 7, 2012, filing.  (Doc. 22-5.)  Judge Lewis noted that, "[a]lthough the

petition appeared untimely on its face, out of an abundance of caution, this Court held two

evidentiary hearings to ensure a thorough review of Petitioner's serious claims."  (Doc. 22-5

at 4.)   No claim was specifically reviewed, but PCRA hearing testimony was referenced and

summarized.  (*Id.* at 4-6.)   Judge Lewis then stated the following:

> Despite the contentions presented during the Hearings, this Court believes that the case of *Commonwealth v. Hall*, [771 A.2d 1232 (Pa. 2001),] is factually on point and controls our determination that we are without jurisdiction to consider the merits of Petitioner's PCRA claims as his petition was untimely filed. Additionally, this Court finds that Mr. Risjan has failed to plead an exception to the one year statutory time bar.

(Doc. 22-5 at 6.)

Regarding timeliness, the Court found that Petitioner had until July 29, 2010, to file a timely PCRA petition and, because he had not done so, the Petition was untimely pursuant to 42 Pa. C.S.A. § 9545(b) unless a recognized exception to the filing requirement applied. (*Id.* at 2-4.) Focusing on the exception to the timely filing requirement for newly discovered facts, § 9545(b)(1)(ii), the Court noted that the exception "requires a petitioner to demonstrate he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence." (*Id.* at 3 (citing *Commonwealth v. Monaco*, 996 A.3d 1076, 1080 (Pa. Super. Ct. 2010)).) The Court did not further discuss the application of the newly discovered evidence exception which allows a petitioner sixty days from the discovery of the facts giving rise to the exception to file a petition. (*See id.* at 3-7.) Rather, the Court reviewed the PCRA Hearing testimony relative to expectations that Sheldon would file an appeal and, without making an overt credibility determination, stated the PCRA Petition was untimely filed and Petitioner did not plead or prove an exception to the one-year statutory time bar. (*Id.* 4-6.)

In his Declaration, Petitioner asserts that he did not learn that his state court PCRA Petition had not been timely filed until June 29, 2014, when Logue sent him a copy of the June 17, 2014, Order. (Doc. 18-1 at 5-6 ¶ 23.) Petitioner adds that, in response to this finding, he and his grandmother requested that his attorneys return his legal papers, including trial transcripts and discovery material. (*Id.* at 6 ¶ 24.)

A notice of appeal of the PCRA Court's was docketed in the Superior Court on July 11, 2014. (Doc. 22-3 at 2.)

Because Logue and Pitonyak failed to return the legal materials requested, Petitioner filed a "Motion to Remove Counsel and Proceed from a *Pro Se* Standing." (*Id.* ¶ 25.) In response to this motion, which Petitioner filed on November 12, 2014, the Superior Court entered an Order directing the PCRA Court to conduct a hearing pursuant to *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998), to determine if Petitioner's choice to proceed without counsel was made knowingly, intelligently, and voluntarily. (Doc. 22-8 at 3.) On December 22, 2014, the PCRA Court granted the motion to proceed *pro se* on appeal.[2]

(Doc. 22-2 at 11.) Petitioner's attorneys were directed to forward all legal materials to Petitioner within thirty days of receipt of the Order. (*Id.*)

Petitioner states that he was unable to file the instant § 2254 petition until his legal papers were returned to him. (Doc. 18-1 at 6 ¶ 27.) He filed this action on February 6, 2015. (Doc. 1.)

In the July 28, 2015, Memorandum and Order, the Superior Court identified the following issues raised by Petitioner in his *pro se* brief: 1) whether he was denied effective

---

[2] Attorneys Logue and Pitonyak filed a brief in support of the appeal on November 24, 2014. (Doc. 22-3 at 3; Doc. 22-6.) On January 6, 2015, the brief was stricken from the docket based on Petitioner having been granted *pro se* status. (Doc. 22-3 at 4.) Respondents attached the stricken brief as an exhibit to their filing (Doc. 22-6), but they did not provide Petitioner's *pro se* brief.

assistance of PCRA counsel where, following counsels' retention, they abandoned him for nearly a year, failing to timely seek PCRA review on Petitioner's behalf; and 2) whether Petitioner was entitled to have his sentence vacated on the basis of *Commonwealth v. Wolfe*, 106 A.3d 800 (Pa. Super. Ct. 2014). (Doc. 22-8 at 3.) He argued that PCRA counsel was ineffective for waiting nearly a year to file the PCRA petition although they were retained by Petitioner's family for the precise purpose of filing it and for failing to invoke any of the time bar exceptions in the PCRA Petition they filed. (*Id.* at 4.) The Superior Court concluded that the claim was unreviewable because Petitioner raised the claim for the first time on appeal:

> It is well established that claims of PCRA's counsel's ineffectiveness may not be raised for the first time on appeal. *See* [*Commonwealth v. Henkel*, 90 A.3d 16, 20, 22-30 (Pa. Super. 2014)] (thoroughly discussing Pennsylvania precedent holding that an appellant may not raise claims of PCRA counsel ineffectiveness for the first time on appeal); *see also Commonwealth v. Ford*, 44 A.3d 1190, 1200-01 (Pa. Super. 2012) (stating that "issues of PCRA counsel effectiveness must be raised in a serial PCRA petition or in response to a notice of dismissal before the PCRA court. Therefore, . . . claims of PCRA counsel ineffectiveness cannot be raised for the first time after a notice of appeal has been taken from the underlying PCRA matter."); *see also* Pa. R.A.P. 302(a) (stating that a claim cannot be raised for the first time on appeal).

(Doc. 22-8 at 5.) Stating that they expressed no opinion on the merits of Petitioner's PCRA counsel ineffectiveness, the Court noted that Petitioner "retains the right to raise the claim in a subsequent PCRA petition, and/or invoke any of the time bar exceptions." (*Id.* at 6.) The Superior Court concluded that Petitioner's second issue, based on *Wolfe*, 106 A.3d at 805-06, and *Alleyne v. United States*, 133 S. Ct. 2151 (2013), was without merit in that the

Superior Court had held that the right announced in *Alleyne* was not retroactive to cases on collateral review. (Doc. 22-8 at 6-7 (citing *Commonwealth v. Miller*, 102 A.3d 988, 995 (Pa. Super. 2014)).)

In response to the Superior Court's decision that the PCRA Court had properly determined that Petitioner's May 2012 PCRA was not timely filed (Doc. 22-8 at 8), Petitioner filed a second PCRA petition pro se on October 1, 2015. (Doc. 22-2 at 12.) On October 26, 2015, Jennifer Tobias, Esquire, was appointed to represent Petitioner. (*Id.*)

On January 26, 2016, Tobias filed the Motion to Withdraw Under the Post Conviction Relief Act in the Dauphin County Court of Common Pleas. (Doc. 22-9.) In setting out the background of the case, she noted that "[e]ven though counsel did not file a timeliness exception, the PCRA Court held two evidentiary hearings to determine whether Attorney Sheldon was ineffective for failing to file an appeal on the defendant's behalf." (Doc. 22-9 at 6 ¶ 6.) Tobias stated that Petitioner "asserts the second PCRA petition falls within the time-bar exception at 42 Pa. C.S.A. § 9545(b)(1)(ii), based on his claim of abandonment by previous PCRA counsels." (Doc. 22-9 at 7-8 ¶ 19.) After asserting that the petition was filed three days after the due date (*id.* at 8 ¶ 19), Tobias acknowledged that Petitioner had provided evidence that his petition was timely-filed under the prisoner mailbox rule and she proceeded to discuss the allegations contained in the petition. (*Id.* at 8-9 ¶ 19.)

Regarding ineffectiveness of PCRA counsel, Tobias reviewed the relevant legal framework,[3] the timeline asserted by Petitioner, and PCRA Hearing testimony. (*Id.* at 9-12 ¶ 20.) She then concluded that Sheldon was not ineffective for failing to file an appeal on behalf of Petitioner based on her review of the PCRA hearing testimony:

> It appears that Attorney Sheldon informed the defendant and his family that he was not going to file an appeal, and actually referenced another attorney to handle the appeal. Ms. Risjan wrote a letter to Attorney Sheldon questioning why he didn't want to work on an appeal, and did not contact him again until a year after the sentencing.

---

[3] Tobias set out the following legal framework regarding ineffective assistance of counsel:

> In any ineffectiveness claim, counsel is presumed to be effective and therefore, the petitioner has the burden of establishing ineffective assistance of counsel. *Commonwealth v. Breakiron*, 729 A.2d 1088 (Pa. 1999); *Commonwealth v. Howard*, 749 A.2d 941 (Pa. Super. 2000).
>
> To prevail on a constitutional claim of ineffectiveness of counsel, one must demonstrate: (1) that his claim has arguable merit; (2) that counsel's actions or inaction was not the product of a reasonable strategic decision; and (3) that he suffered prejudice because of counsel's action or inaction. *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987).
>
> Since the defendant is arguing PCRA counsel was ineffective for failing to include a timeliness exception in order to review the allegations concerning the ineffectiveness of trial counsel, this is a layered claim of ineffectiveness. In the case of *Commonwealth v. McGill*, 832 A.2d 1014 (Pa. 2003), the court clarified the law on layered ineffectiveness claims brought under the PCRA and set forth in detail the framework for pleading and proving such claims. When an issue is presented via a layered claim of ineffectiveness, the only viable claim is that related to the most recent counsel, usually appellate counsel. *Id.* at 1022. A petitioner must then present the claim of ineffectiveness of appellate counsel through the three-pronged test of *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987). *Id.* Because it is a nested claim, in order to establish the first prong of the *Pierce* test as to the performance of appellate counsel, a petitioner is required to demonstrate the ineffectiveness of trial counsel. In other words, a petitioner must establish all three prongs of the *Pierce* test as to trial counsel's ineffectiveness before the question of appellate counsel's ineffectiveness can be addressed. *Id.* at 1022-23.

(Doc. 22-9 at 9-10.)

Therefore, even if the first PCRA had been timely filed, the claim of ineffectiveness of trial counsel had no merit and would not have warranted relief.

(Doc. 22-9 at 12 ¶ 20.)

This conclusion led to Tobias's assertion that "[b]ecause trial counsel cannot be found ineffective, the claim of ineffectiveness of PCRA Counsel must also fail." (*Id.* ¶ 21.)

She reasoned as follows:

As stated, the defendant hired PCRA counsel in May, 2011, and their appearance was entered on August 1, 2011. An amended PCRA Petition was filed on behalf of the defendant on May 3, 2012, almost two years after the PCRA filing deadline.

In his pro se Petition, the defendant states that PCRA counsel abandoned him for nearly a year and failed him by not filing a timely petition or not seeking a timeliness exception. The defendant asserts that counsel failed to consult with him concerning the late filing of the PCRA Petition, and he only learned of the late filing when he was sent a copy of This [sic] Court's June 17, 2014 Order dismissing the PCRA Petition. Additionally, the defendant indicates that PCRA counsel informed him that his PCRA Petition "would and had been filed within 60 days of my learning that Attorney Sheldon had failed to file the requested direct appeal on my behalf". [sic] (Exhibit B, paragraph 21).[4]

Petitioner [Tobias] respectfully disagrees with this allegation, as the defendant did not even retain PCRA Counsel until after the 60-day requirement expired. The defendant admits that he contacted the Superior Court in September of 2010, questioning the status of his appeal. At that point in time, any PCRA Petition filed would have been untimely, as the defendant had until July 29, 2010 to file a timely PCRA Petition. To invoke an exception, a defendant must include a precise date when he learned of the after-discovered evidence to allow the court to determine whether the exception has been timely

---

[4] Respondents do not provide the referenced exhibit. However, from the content identified, it appears that Exhibit B is similar if not the same as Petitioner's Declaration dated May 21, 2015, and filed in this Court on March 24, 2016. (*See* Doc. 18-1.)

invoked, as required by *Commonwealth v. Beasley*, 741 A.2d 1258, 1261-62 (Pa. 1999). The defendant did not included [sic] a precise date. However, even if we used the month of January 2011 as the date the defendant knew Attorney Sheldon was not filing an appeal, the 60-day requirement would end in March 2011. The defendant acknowledges that he attempted to retain an attorney from January through March of 2011, but failed. (Exhibit B, paragraph 17). Then in April, the defendant asked his grandmother to find an attorney to take over his case, and PCRA Counsel were retained in May of 2011. The defendant admits to looking for an attorney for 4 months, and then in month 5, requested his grandmother to retain counsel. This time period exceeds the 60-day requirement needed to invoke a timeliness exception for PCRA review, through no fault of PCRA Counsel.

Therefore, PCRA Counsel cannot be found ineffective for failing to include a timeliness exception in the PCRA Petition.

(Doc. 22-9 at 12-14 ¶ 21.)

By Memorandum Order of June 24, 2016, Judge Lewis concluded that there were no genuine issues concerning any material fact and Petitioner was not entitled to post-conviction collateral relief because the Court was without jurisdiction. (Doc. 22-10 at 8.) He also granted Tobias permission to withdraw from PCRA representation. (*Id.*) Having adopted Tobias's timeline, the PCRA Court concluded that Petitioner had not included a precise date when he learned that a direct appeal had not been filed and, assuming *arguendo* that he knew Sheldon had not filed an appeal in January 2011, Petitioner did not file a PCRA petition within the required sixty days of learning that fact. (*Id.* at 6.) Because PCRA counsel was retained in May 2011 and the sixty-day period had expired at the end of March 2011, the Court concluded that the timeliness exception could not be invoked through no fault of initial PCRA counsel. (*Id.*) With these findings, Judge Lewis concluded

PCRA counsel could not be found ineffective for failing to include a timeliness exception in the PCRA Petition.  (*Id.* at 6-7.)

A Notice of Appeal of the PCRA Court's decision was docketed in the Superior Court on December 15, 2016.  2021 MDA 2016 Superior Court Docket.  Petitioner filed three applications for extensions of time to file a supporting brief, the third of which was granted on June 2, 2017, because Petitioner had been proceeding *pro se* and recently obtained counsel who would prepare a brief.  *Id.*  When a brief was not filed by the June 23, 2017 deadline, the appeal was dismissed for failure to file a brief.  *Id.*

### III.  PROCEDURAL BACKGROUND

This is the second R&R by Magistrate Judge Mehalchick recommending dismissal of the § 2254 petition.  In the first R&R (Doc. 10), upon screening conducted pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, Magistrate Judge Mehalchick recommended that the petition be dismissed as untimely. (Doc. 10 at 1.)  Petitioner filed objections to the R&R, asserting that the petition "should not be summarily dismissed without the opportunity for further record development."  (Doc. 11 at 10.)   Based on the objection, the Court conducted *de novo* review of the R&R and all relevant documents and concluded the record did not support a determination that Petitioner was not entitled to relief.  (Doc. 13 at 2.)  After noting that Petitioner did not object to the Magistrate Judge's finding that his petition was procedurally time-barred, the Court adopted the R&R's analysis and finding that Petitioner was time-barred absent an equitable

tolling exception.  (*Id.*)   However, regarding the R&R's conclusion that Petitioner was not entitled to equitable tolling, the Court noted that Petitioner provided his Declaration (Doc. 11, Addendum A) containing additional assertions and, if true, the assertions could provide support for a finding that Petitioner would be entitled to equitable tolling.  (*Id.* at 3.)  The Court also determined that the record was insufficiently developed to properly assess the conduct of Petitioner's trial attorney.  (*Id.*)  With these findings, the Court determined it would be prudent for the petition to be re-screened by the Magistrate Judge.  (*Id.*)  The Court noted that Petitioner was entitled to supplement the record with evidence that he was entitled to equitable tolling of the statute of limitations.  (*Id.* at 4.)

Thereafter, Magistrate Judge Mehalchick issued a notice of election pursuant to *United States v. Miller*, 197 F.3d 644 (3d Cir. 1999), and *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000).[5]  (Doc. 14 at 2.)  After Petitioner elected to proceed with his petition as filed (Doc. 15), the Magistrate Judge provided Petitioner an opportunity to supplement the

---

[5] *See U.S. v. Miller*, 197 F.3d 644, 652 (3d Cir. 1999) ("[U]pon receipt of pro se pleadings challenging an inmate's conviction or incarceration-whether styled as a § 2255 motion or not - a district court should issue a notice to the petitioner regarding the effect of his pleadings. This notice should advise the petitioner that he can (1) have his motion ruled upon as filed; (2) if his motion is not styled as a § 2255 motion have his motion recharacterized as a § 2255 motion and heard as such, but lose his ability to file successive petitions absent certification by the court of appeals; or (3) withdraw the motion, and file one all-inclusive § 2255 petition within the one-year statutory period."); *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000) (extending *Miller*'s notice requirements to § 2254 actions and vacating the district court's dismissal of a § 2254 petition because Mason, as a *pro se* petitioner, was not given the required *Miller* notice and instructions); *see also, Holden v. Mechling*, 133 Fed.Appx. 21 (3d Cir. 2005) (affirming the district court's dismissal of petitioner's § 2254 writ as untimely during a screening pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, when the court had previously issued "the required" *Miller* notice).

record.  (Doc. 16.)  Petitioner did so, submitting the same Declaration and Attachments as he had previously (*compare* Doc. 11 at 34-58, *with* Doc. 18-1), as well as a narrative explanation of events which transpired (Doc.18).  Upon review of Petitioner's filing, Magistrate Judge Mehalchick determined that the petition should be served on respondents and issued the appropriate Order.  (Doc. 19.)

With the filing of Respondent's Answer to Petition for Writ of Habeas Corpus (Doc. 22) and Respondent's Brief in Opposition to Petition for Writ of Habeas Corpus (Doc. 22-1), Respondents filed numerous documents related to Pennsylvania State court proceedings (Doc. 22-2 through 22-11).  Upon this developed record, Magistrate Judge Mehalchick issued the R&R now under consideration in which she concluded that Petitioner was not entitled to equitable tolling and, even if were, his claims are procedurally defaulted and he has not shown cause and prejudice for the default.  (Doc. 29 at 6-22.)

After Magistrate Judge Mehalchick filed the R&R, Attorney Jerome Brown entered his appearance on behalf of Petitioner (Doc. 36) and filed objections to the R&R (Doc. 43).  Petitioner objects to the finding that he is not entitled to equitable tolling and he has not presented grounds to excuse the procedural default of his claims.  (Doc. 43 at 13-22,)  Respondents did not file a response to the objections.

## IV.  STANDARD OF REVIEW

A District Court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and

recommendations for the disposition" of certain matters pending before the Court. 28 U.S.C. § 636(b)(1)(B).  If a party timely and properly files a written objection to a Magistrate Judge's Report and Recommendation, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  *Id.* at § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3); M.D. Pa. Local Rule 72.3; *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).  "If a party does not object timely to a magistrate judge's report and recommendation, the party may lose its right to *de novo* review by the district court."  *EEOC v. City of Long Branch*, 866 F.3d 93, 99-100 (3d Cir. 2017).  However, "because a district court must take some action for a report and recommendation to become a final order and because the authority and the responsibility to make an informed, final determination remains with the judge, even absent objections to the report and recommendation, a district court should afford some level of review to dispositive legal issues raised by the report."  *Id.* at 100 (internal citations and quotation marks omitted).

## V.  ANALYSIS

With Petitioner's Objections to the Report and Recommendation, he asserts generally that "ineffective assistance of prior counsel should compel the Court to hear this matter" and states "there are multiple grounds of ineffective assistance in the Pennsylvania Courts, which supply 'cause' and 'prejudice' for permitting the Court to open the habeas corpus gateway."  (Doc. 43 at 13.)  Although Petitioner's filing focuses on the underlying merits of the claims raised in his habeas petition (Doc. 43 at 22-47), the Court concludes he

specifically objects to the R&R's conclusion that he is not entitled to equitable tolling and, if

he were, he has not shown cause and prejudice for the procedural default of his claims (*id.*

at 14-16).  Thus, the Court will conduct *de novo* review of these matters.

A.    Equitable Tolling

The threshold issue presented here is whether Petitioner is entitled to equitable

tolling of the statutory period for a habeas petition.  The Magistrate Judge found that

Petitioner was not entitled to equitable tolling because he did not present evidence which

made the requisite showing.  (*Id.* at 6-22.)

As a general matter, because AEDPA's one-year limitation period set out in 28

U.S.C. § 2244 (d)(1)(A) is not jurisdictional, it is subject to equitable tolling in appropriate

cases.  *Holland v. Florida*,  560 U.S. 631, 645 (2010).   However, the remedy of equitable

tolling is to be used "only sparingly . . . when principles of equity would make the rigid

application of a limitation period unfair."  *Jenkins v. Superintendent of Laurel Highlands*, 705

F.3d 80 (3d Cir. 2013) (internal quotations and citations omitted).  In *Ross v. Varano*, 712

F.3d 784 (3d Cir. 2013), the Circuit Court noted that there are "no bright lines in determining

whether equitable tolling is warranted in a given case."  *Id.* at 799 (citation omitted).  *Ross*

further explained that in *Holland v. Florida*,

> the Supreme Court emphasized that in considering whether there could be
> equitable tolling, courts should favor flexibility over adherence to mechanical
> rules. [560 U.S. at 650]. In this regard, "the particular circumstances of each
> petitioner must be taken into account," *Pabon* [*v. Mahanoy*, 654 F.3d 385, 399
> (3d Cir. 2011)], and each decision made on a "case-by-case
> basis." *Holland*, [560 U.S. at 649-50] (quoting *Baggett v. Bullitt*, 377 U.S. 360,

375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964)). Thus, we must "exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Holland*, [560 U.S. at 560 U.S. at 650]. We have held that equitable tolling is appropriate when principles of equity would make the rigid application of a limitation period unfair, but that a court should be sparing in its use of the doctrine. *Pabon*, 654 F.3d at 399; *Jones v. Morton*, 195 F.3d 153, 159 (3d Cir.1999).

712 F.3d at 799.

*Holland* confirmed the application of the requirements necessary to show that a petitioner is entitled to equitable tolling of the AEDPA's one-year limitation period previously set out in *Pace v. DiGuglielmo*, 544 U.S. 408 (2005): "'a petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing.'" *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418).[6]

---

[6] Additionally, § 2244(d)'s timeliness requirements do not bar a claim where a petitioner makes a credible showing of actual innocence: "To invoke the miscarriage of justice exception to AEDPA's statute of limitations, . . . a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). *McQuiggin* rejected the State's argument that "habeas petitioners who assert convincing actual-innocence claims must prove diligence to cross a federal court's threshold." 569 U.S. at 399; *see also Reeves v. Fayette SCI*, 897 F.3d 154, 157 (3d Cir. 2018), *as amended* (July 25, 2018), *cert. denied sub nom. State Corr. Inst. at Fayette v. Reeves*, No. 18-543, 2019 WL 2493953 (U.S. June 17, 2019).

Although Petitioner has consistently maintained his innocence, he does not object to the R&R's conclusion that he has not presented the requisite newly discovered evidence. (Doc. 29 at 21.)

l

In support of his entitlement to equitable tolling, Petitioner's gateway to habeas relief, Petitioner states that "trial Counsel's actions after sentencing demonstrate he abandoned Mr. Risjan, which would provide a basis for equitable tolling" (*id.* at 16), and "the performance of the PCRA Counsel also demonstrates abandonment and provides a basis for equitable tolling" (*id.* at 21). Attorney abandonment goes to the extraordinary circumstances prong of the inquiry. *Holland*, 560 U.S. at 651 (citing *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001); *Ross*, 712 F.3d at 788, 797 n.21; *Jenkins*, 705 F.3d at 89-90.

Because the Magistrate Judge first found that Petitioner had not been reasonably diligent and conducted the extraordinary circumstances inquiry only "[i]n the interest of completeness" (Doc. 29 at 10), the Court will address both prongs of the equitable tolling inquiry.

## 1. Due Diligence

*Ross* summarized Supreme Court and Circuit Court precedent regarding the due diligence prong of the equitable tolling inquiry:

> [t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum, extreme, or exceptional diligence. *Holland,* [560 U.S. at 653]. "This obligation does not pertain solely to the filing of the federal habeas petition, rather it is an obligation that exists during the period appellant is exhausting state court remedies as well." *LaCava v. Kyler,* 398 F.3d 271, 277 (3d Cir. 2005) (citing *Jones,* 195 F.3d at 160). A determination of whether a petitioner has exercised reasonable diligence is made under a subjective test: it must be considered in light of the particular circumstances of the case. *See Schlueter v. Varner,* 384 F.3d 69, 74 (3d Cir. 2004) ("Due diligence does not require the maximum feasible diligence, but it does require diligence *in the circumstances.*") (emphasis added) (internal quotation marks and citation omitted); *see also Doe v. Busby,* 661 F.3d 1001, 1013 (9th Cir.

2011) ("To determine if a petitioner has been diligent in pursuing his petition, courts consider the petitioner's overall level of care and caution *in light of his or her particular circumstances.*" (emphasis added)).

The fact that a petitioner is proceeding pro se does not insulate him from the "reasonable diligence" inquiry and his lack of legal knowledge or legal training does not alone justify equitable tolling. *See Brown v. Shannon,* 322 F.3d 768, 774 (3d Cir. 2003) (equitable tolling not justified where petitioner had one month left in limitations period in which he could have "fil[ed] at least a basic pro se habeas petition" at the time that petitioner's attorney informed him that he would not file an appeal in state court on his behalf and could no longer adequately represent him); *see also Doe v. Menefee,* 391 F.3d 147, 177 (2d Cir. 2004) ("Given that we expect pro se petitioners to know when the limitations period expires ... such inadvertence on Doe's part cannot constitute reasonable diligence.").

*Ross,* 712 F.3d at 799-800.

Given the circumstances of this case, the Court finds that Petitioner pursued his rights diligently. Petitioner testified that he told Sheldon that he wanted to appeal the verdict when Sheldon visited him at the Dauphin County prison after the verdict and before sentencing. (Doc. 22-7 at 13 (Tr. at 11:23-12:13).) Sheldon did not recall visiting with Petitioner at the prison but said "I am not saying that I didn't" (*id.* at 16 (Tr. at 24:2-3)), "I may or may not have been there" (*id.* (Tr. at 25:12-13)). He did not recall having conversations about the appeal with Petitioner:

I don't recall that conversation because I made it clear to the family and if I did meet with Mr. Risjan, I would have made it clear to him that I didn't feel capable of handling the appeal and send him to another attorney.

But I was doing primary conversations with his grandmother. They were the ones talking with me mostly. Those were the people that I probably talked with. I do not remember talking to Mr. Risjan between the date of verdict and date of sentencing.

(Doc. 22-7 at 16 (Tr. at 25:20-26:5).) With Petitioner's distinct recollection of talking with Sheldon about the appeal and Sheldon's equivocal response on the subject, the Court finds it appropriate to conclude that some conversation about appeal of the verdict occurred between the verdict and sentencing.

Crediting that Sheldon "told the family at that point in time that I didn't feel capable, if they were planning to appeal it, to hand any appeal, that they needed a new fresh set of eyes" (Doc. 22-7 at 14 (Tr. 18:21-24)), the Court does not consider this testimony to be the equivalent of the restatement offered by the attorney for the District Attorney's office that Sheldon "informed [the family] [he] would not pursue an appeal . . . on behalf of Mr. Risjan" (*id.* (Tr. at 19:1-2)) with which Sheldon agreed (*id.* (Tr. at 19:3-4)). Rather, Sheldon's recitation of his post-verdict statement was indicative of how he was feeling "at that point in time" where the restatement was a definitive declaration of his intent of terminating his representation.

Although Sheldon testified "at no time did I ever tell them that I would handle the appeal, did I give them that impression" (Doc. 22-7 at 15 (Tr. 21 at 1-3)), he confirmed that he never formally withdrew his representation of Petitioner and never filed a motion to do so (*id.* (Tr. at 22:20-23, 23:15-18)). Sheldon did not dispute that his name remained on the docket up until the time that Attorneys Logue and Pitonyak entered their appearance. (*Id.* (Tr. at 23:7-14).) When asked whether he ever visited Petitioner after sentencing to advise him about the necessity of getting an appeal filed and getting someone else to file an

appeal, Sheldon responded that he did not remember going to see him.  (*Id.* at 15-16 (Tr. at 23:19-24:3).)  When asked about a specific letter Ms. Risjan sent after the verdict in which she discussed filing an appeal, Sheldon said he believed she was asking him to consider remaining on the case.  (*Id.* (Tr. at 26: 6-23).)  Sheldon further testified that he did not remember receiving any phone calls from Ms. Risjan between verdict and sentencing.  (*Id.* (Tr. at 26:24-27:15).)  When asked whether he had responded to the letter in any way indicating that he would not be filing an appeal and making sure that she had someone representing Petitioner to secure his appellate rights Sheldon responded that he probably did but he didn't know—if he had responded the letter would be in his file.  (Doc. 22-7 at 17 (Tr. at 28:23-29:3).)  No such letter was produced.  Sheldon stated that he did not remember follow-up calls from Ms. Risjan due to a lack of response to the letter but he "didn't keep records of who called what hour, what day."  (*Id.* (Tr. at 29:8-30:2).)

Nothing in Sheldon's testimony directly contradicts Petitioner's statement that, after the sentencing, he believed that Sheldon was handling the appeal.  (Doc. 22-7 at 13 (Tr. at 13: 15-17).)  Importantly, evidence of record shows that Petitioner communicated with the Dauphin County Court of Common Pleas, Pennsylvania Superior Court, and Sheldon about the appeal.  (Doc. 18-1 at 9, 11, 13, 15.)  As will be discussed below in greater detail, the correspondence attached to Petitioner's Declaration (*id.*), lends credence to Petitioner's statement that he wrote to Sheldon on numerous occasions although his letters are not part

of the record before the Court.[7]  (*See, e.g.*, Doc. 18-1 at 2-4 ¶¶ 5, 8, 1012,15, 17.)  The

correspondence directly contradicts Sheldon's testimony that his written communication

from Petitioner and his family was limited to bible quotes from them which had been sent

before the trial.  (Doc. 22-7 at 14-15 (Tr. at 19:20-20:4).)

       Thus, the Court concludes that Petitioner reasonably believed Sheldon was handling

his appeal.  Having discounted Sheldon's credibility regarding correspondence, the Court

has no reason to doubt that Petitioner wrote to him approximately two weeks after the

sentencing concerning issues to be raised on appeal.  (Doc. 18-1 at 2 ¶ 5.)  When neither

Petitioner nor his grandmother heard from Sheldon, Petitioner contacted the Dauphin

County Clerk of Court in September 2009.  (*Id.* ¶ 6.)  In correspondence dated November

3, 2009, the Clerk of the Court for Dauphin County responded to Petitioner's

correspondence and advised him that his request could not be accommodated because:

       Requests for information/copies must come from your attorney of record.

       Your motion/request has been sent to your attorney of record as per rule
       576(A)(4).

       This office does not have or is unable to accommodate your request.

       Comments: Pursuant to the Pennsylvania Rules of Appellate Procedure, once
       an appeal is filed, all records are transmitted to the Pennsylvania Superior

---

[7]  The documentary letter evidence indicates that the PCRA Hearing question from Logue regarding post-sentencing communication with Sheldon where Petitioner responded that he had confirmed that he had no further communication with him after the sentencing was interpreted by Petitioner to be related to the immediate post-sentencing period rather than through the time period at issue in this case.  (*See* Doc. 22-7 at 13 (Tr. at 13:18-25).)

Court.  Any questions you have concerning your case should be addressed to your attorney of record, J. Michael Sheldon, Esq.

(Doc. 18-1 at 9 (emphasis in original).)   In general, this correspondence shows that Petitioner reasonably believed that Sheldon continued to represent him.  Further, the references in the "Comments" section of the correspondence to "Appellate Procedure" and the transmittal of records to the Superior Court provide a basis for Petitioner to reasonably have believed that an appeal had been filed.

As directed by the Dauphin County correspondence, Petitioner wrote to Sheldon on November 12, 2009, and December 14, 2009, seeking the information he had requested from the Court and inquiring about Sheldon's lack of communication.  (Doc. 18-1 at 3 ¶¶ 8, 11.)   Sheldon acknowledged Petitioner's letters on February 8, 2010.  (*Id.* at 11.)  He advised Petitioner that he "should refrain from communicating directly with the courts.  As your attorney of record, all questions you have concerning your case should be forwarded directly to me." (*Id.*)   Curiously, Sheldon did not provide Petitioner with any information about an appeal.  However, because the Dauphin County correspondence gave Petitioner reason to believe that an appeal had been filed and Sheldon did not inform him otherwise and confirmed that he remained the attorney of record who would answer questions about the case, Petitioner's belief that an appeal had been filed remained reasonable.

Petitioner continued to diligently pursue his rights when he wrote to Sheldon about the status of his appeal in March, April, and May of 2010, and, after hearing nothing, asked his grandmother in June 2010 to contact Sheldon directly to find out the status of the appeal

and get a copy of appeal papers.[8]  (Doc. 18-1 at 3 ¶¶ 10-11.)   In July 2010, Petitioner

learned that Sheldon would not give his grandmother the file material she had requested so

Petitioner wrote asking that Sheldon provide him with the documentation directly.  (*Id.* ¶ 12.)

When Petitioner heard nothing following his direct request to Sheldon, he wrote to the

Pennsylvania Superior Court in September 2010.  (Doc. 18-1 at 4 ¶ 13.)  The Superior

Court Deputy Prothonotary responded on October 5, 2010, informing Petitioner that "[a]ny

request for a copy of appellate briefs filed on your behalf should be made directly to

Attorney Sheldon."  (Doc. 18-1 at 13.)

 The Court finds that the information from the Superior Court provided a basis for

Petitioner to continue to reasonably believe that an appeal had been filed on his behalf in

that he was not told otherwise and the Superior Court's reference to "appellate briefs filed

on your behalf" could reasonably have led Petitioner to conclude that in fact an appellate

brief had been filed by Sheldon.  Further, Petitioner continued to diligently pursue his rights

when he immediately wrote to Sheldon and demanded that he be apprised of the status of

his appeal, that Sheldon provide him or his grandmother with a copy of the brief filed on his

behalf, and, if Sheldon was not going to do this, that "he should do whatever he needed to

do to have a new attorney take over [the] case."  (Doc. 18-1 at 4 ¶ 15.)  Sheldon's

December 2010 letter was only partially responsive to Petitioner's request in that he failed to

---

[8] Although Sheldon testified that the requests came after appellate and PCRA deadlines had passed, he
testified that he had gotten calls from Ms. Risjan asking for file materials but he did not feel comfortable
releasing them to a relative.  (Doc. 22-7 at 16-17 (Tr. at 27:20-28:1).)

provide any direct information about the appeal although he stated that Petitioner should direct questions to him rather than the court. (Doc. 18-1 at 15.) Sheldon's comment regarding new counsel sheds no light on the status of the appeal because the statement "*[i]f it is your desire* to retain new counsel *to take over your case,* you should instruct new counsel to contact me to arrange retrieval of your file" (Doc. 18-1 at 15 (emphasis added)) left it up to Petitioner whether he wanted Sheldon, the attorney of record, to remain on the case or get new counsel and suggested that there was ongoing activity, i.e., something to "take over." Thus, Sheldon's response to Petitioner did not provide a basis for Petitioner to conclude that no appeal had been filed.

This state of affairs supports Petitioner's statement that he was unsure how to proceed after receiving the letter and he attempted to contact a number of attorneys to take over his case from January through March 2011,. (*Id.* at 4 ¶ 17.) The Court does not find Petitioner's failure to immediately file a *pro se* federal habeas or PCRA petition to show a lack of reasonable diligence for several reasons: 1) Sheldon did not inform Petitioner that he did not remain his attorney of record or that he was not pursuing Petitioner's rights (Doc. 18-1 at 15); 2) Petitioner had been informed by the Dauphin County Court of Common Pleas and Pennsylvania Superior Court that he could only receive information about his case from his attorney of record (*id.* at 9, 13); 3) Sheldon had not provided information requested and had not been willing to release records to Petitioner or his grandmother (*id.* at 3-4 ¶¶ 12-13); and 4) Sheldon said that he would provide the file to new counsel upon new counsel's

request (*id.* at 15). Under these circumstances, Petitioner was reasonably diligent in pursuing his rights when he immediately endeavored to seek new counsel. Petitioner exhibited perseverance in determining the status of the appeal he reasonably believed Sheldon had filed. As attorney of record who was contacted numerous times by Petitioner and informed by the Dauphin County Court of Common Pleas and the Pennsylvania Superior Court that Petitioner had sought information about his appeal, Sheldon *never* informed Petitioner that no appeal had been filed. As Petitioner reasonably believed from directives provided by the Courts and Sheldon that he could only access information about his case from Sheldon or a new attorney, he arguably was without the legal information he needed to undertake a *pro se* filing and sought counsel to obtain the material and pursue his rights. Thus, Petitioner did "what he reasonably thought was necessary to preserve his rights . . . based on the information he received[.]" *See Munchinski* [*v. Wilson*, 694 F.3d 308, 332 (3d Cir. 2012)]. Although *Holland* found reasonable diligence where the petitioner acted quickly to file a *pro se* habeas petition after learning of the dismissal of his state court proceedings, 560 U.S. at 653, *Holland* did not indicate that such action on the part of a petitioner was a prerequisite to a finding of reasonable diligence but rather stressed flexibility and the importance of considering the specific circumstances of the case, *id.* at 650, as the Court has done here.

The foregoing analysis applies irrespective of whether Petitioner had reason to suspect that no appeal had been filed or when he learned no appeal had been filed. This

aspect of his case and relevant PCRA Court findings will be discussed below, but for purposes of the due diligence inquiry, Petitioner's specific knowledge about the status of his case during the period he was looking for a new attorney from January until May 2011 does not impact the reasonability of his belief that he needed an attorney to procure his legal documents and  proceed with his case.  The fact that new counsel was engaged at the beginning of May 2011 and paid the initial non-refundable sum of $20,000 with another non-refundable $10,000 due within ninety days for the purpose of pursuing Petitioner's appellate rights exhibits ongoing reasonable diligence.  Finally, the fact that the attorneys did not file the PCRA petition for over a year after they were hired does not show, as the Magistrate Judge found, that Petitioner was "'sleeping on his rights.'"  (Doc. 29 at 10 (quoting *Jenkins*, 705 F.3d at 89).)  Rather, Petitioner credibly avers that his PCRA counsel told him his petition would be and had been filed within the time for filing under a PCRA timeliness exception (Doc. 18-1 at 5 ¶ 21) and he only learned otherwise when Judge Lewis issued his decision finding the petition untimely on June 29, 2014 (*id.* ¶ 23).  Thereafter, Petitioner and his grandmother requested that the PCRA attorneys return his legal papers and, when they did not do so, he filed a "Motion to Remove Counsel and Proceed from a *Pro Se* Standing." (*Id.* at 6 ¶¶ 24-25.)  After his motion was granted and the attorneys returned his legal materials as directed by the PCRA court, Petitioner filed the instant § 2254 petition within approximately one month.  (Doc. 18-1 at 6 ¶ 27.)

In sum, as guided by our Circuit Court in *Ross*, the Court has considered Petitioner's overall level of care and caution in light of his particular circumstances and concludes that he exhibited reasonable diligence in pursuing his rights from the time of his conviction up to the point of filing the instant petition. *Ross*, 712 F.3d at 799 (citation omitted).

This determination differs from the R&R's conclusion that Petitioner did not exhibit reasonable diligence for two main reasons: the R&R relied on the PRCA Court's finding that Petitioner knew by January 2011 that no appeal had been filed yet he did not file a PCRA petition until May 2012; and the R&R found that the Court was obligated to adopt facts established by the state court. (Doc. 29 at 9 & n.1 (citing Doc. 22-10 at 6; 28 U.S.C. § 2254(e)(1)).) In contrast, the Court has concluded that compliance or noncompliance with state court filing rules is not necessarily indicative of the level of diligence exhibited and to find otherwise would not be consistent with *Holland's* acknowledgement of the flexibility inherent in equitable procedure. 560 U.S. at 650. Further, for the reasons discussed below, the Court concludes that the January 2011 date established by PCRA II Court is not entitled to § 2254(e)(1)'s presumption of correctness.

With the Court's determination that Petitioner exercised due diligence in pursuing his rights, the Court rejects Respondents' argument to the contrary. Although Respondents did not file a response to Petitioner's objections, they initially argued that Petitioner was not entitled to equitable tolling because he did not exercise proper diligence in pursuing his rights. (Doc. 22-1 at 5.) Like the Magistrate Judge, Respondents credited Sheldon's post-

verdict statement to be definitive (*see id.* at 5-6) and they do not discuss subsequent events which the Court has found render that single statement insufficient to prohibit a finding of due diligence.  The sum of Respondents' due diligence argument is that

> the fee agreement did not include an appeal. . . . At that point, proper diligence would have been to seek out an appeals attorney, and petitioner failed to do that. The PCRA court credited the testimony of trial counsel on the issue of appellate representation, and that determination should remain undisturbed by this Court. There is no evidence that there was any sort of affirmative misrepresentation from the government or any attorney for petitioner regarding his representation that might lead to equitable tolling – for instance, testimony or a document from trial counsel affirming representation on appeal.

(Doc. 22-1 5-6.)

Importantly, the PCRA Court did not base its finding of untimeliness on Sheldon's testimony or make any specific finding related to it so the Court is not disturbing a PCRA Court finding.  The PCRA Court reviewed very limited testimony and, at most, implied that Sheldon's testimony was stronger than Ms. Risjan's but made no explicit findings regarding the overall PCRA Hearing testimony.  (*See* Doc. 22-5 at 5.)  Judge Lewis's determination was based *solely* on his conclusion that the PCRA Court lacked jurisdiction because the Petition was untimely and no exception to the filing requirements was pled or proven.[9]

(Doc. 22-5 at 3-8.)  With the PCRA Court's finding of jurisdictional preclusion, the Court

---

[9] In finding the case controlled by *Commonwealth v. Hall*, 771 A.2d 1232 (Pa. 2001), Judge Lewis determined that he was without jurisdiction to grant Petitioner his appeal rights *nunc pro tunc*, because a criminal defendant who did not file a direct appeal from his judgment and thereafter failed to timely avail himself of the Post Conviction Relief Act could not obtain collateral relief in the form of reinstatement of his appeal rights *nunc pro tunc* outside the requirements of the PCRA.  (Doc. 22-5 at 6-7.)

cannot conclude that the PCRA Court's sparse discussion of the PCRA Hearing testimony

indicates an implicit finding that Sheldon's post-sentencing representation was adequate.

*See infra* n.12.

Moreover, while it is true that there is no document from Sheldon affirming his

representation on appeal, the Court strongly disagrees with Respondents' statement that

"there is no evidence there was any sort of affirmative misrepresentation from . . . any

attorney" (Doc. 22-1 at 6) given Sheldon's extremely misleading correspondence which had

been drafted with the knowledge that Petitioner had sought information about his appeal

directly from state courts and had been denied the requested information because trial

counsel remained counsel of record.  (*See* Doc. 18-1 at 9-15.)  In sum, with their cryptic

consideration of the issue, Respondents have not presented any evidence or argument to

undermine the Court's conclusion that Petitioner exercised due diligence in pursuing his

rights during the relevant period.

2.      *Extraordinary Circumstances*

The second element which must be satisfied to show entitlement to equitable tolling

is "that some extraordinary circumstance stood in [the petitioner's] way and prevented timely

filing.'" *Holland*, 560 U.S. at 649.  Whether the circumstances of this case satisfy the second

prong of the equitable tolling inquiry is judged from a subjective perspective.  *Ross*, 712

F.3d at 802.  *Ross* directed that "[i]n analyzing whether the circumstances faced by [the

petitioner] were extraordinary, 'the proper inquiry is *not how unusual the*

*circumstance* alleged to warrant tolling is among the universe of prisoners, . . . *but rather how severe an obstacle it is for the prisoner* endeavoring to comply with AEDPA's limitations period.'" *Id.* at 802-03 (quoting *Pabon,* 654 F.3d at 400) (emphasis in *Pabon*). *Holland* disagreed with the Eleventh Circuit's rule that "'pure professional negligence' on the part of a petitioner's attorney . . . can never constitute an 'extraordinary circumstance'" that would warrant equitable tolling. 560 U.S. at 644:

> That rule is difficult to reconcile with more general equitable principles in that it fails to recognize that, at least sometimes, professional misconduct that fails to meet the Eleventh Circuit's standard could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling. And, given the long history of judicial application of equitable tolling, courts can easily find precedents that can guide their judgments. Several lower courts have specifically held that unprofessional attorney conduct may, in certain circumstances, prove "egregious" and can be "extraordinary" even though the conduct in question may not satisfy the Eleventh Circuit's rule. *See, e.g., Nara v. Frank,* 264 F.3d 310, 320 (C.A.3 2001) (ordering hearing as to whether client who was "effectively abandoned" by lawyer merited tolling); *Calderon* [v. *U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 128 F.3d 1283, 1289 (9th Cir. 1997)] (allowing tolling where client was prejudiced by a last minute change in representation that was beyond his control); *Baldayaque* [*v. United States*, 338 F.3d 145, 152–53 (2d Cir. 2003)] (finding that where an attorney failed to perform an essential service, to communicate with the client, and to do basic legal research, tolling could, under the circumstances, be warranted); *Spitsyn* [*v. Moore*, 345 F.3d 796, 800–02 (9th Cir. 2003)] (finding that "extraordinary circumstances" may warrant tolling where lawyer denied client access to files, failed to prepare a petition, and did not respond to his client's communications); *United States v. Martin,* 408 F.3d 1089, 1096 (C.A.8 2005) (client entitled to equitable tolling where his attorney retained files, made misleading statements, and engaged in similar conduct).

*Holland*, 560 U.S. at 651.

*Holland* also indicated that an attorney's conduct in relation to the fundamental rules of professional responsibility is relevant to the determination of whether extraordinary circumstances exist, finding it significant that the attorney's "various failures violated fundamental canons of professional responsibility, which require attorneys to perform reasonably competent legal work, to communicate with their clients, to implement clients' reasonable requests, to keep their clients informed of key developments in their cases, and never to abandon a client." 560 U.S. at 652-53 (citing Brief for Legal Ethics Professors et al. as *Amici Curiae* (describing ethical rules set forth in case law, the Restatements of Agency, the Restatement (Third) of the Law Governing Lawyers (1998), and in the ABA Model Rules of Professional Conduct (2009)). *Holland* then noted "in this case, the failures seriously prejudiced a client who thereby lost what was likely his single opportunity for federal habeas review of the lawfulness of his imprisonment." *Id.* at 653.

Pennsylvania Rules of Professional Conduct incorporate these requirements. *See* Pa. R. Prof. Conduct 1.1-1.4, 1.16. It is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Pa. R. Prof. Conduct 8.4.

Rule 1.16 specifically addresses "Declining or Terminating Representation" and provides the following in pertinent part:

(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client;

. . . .

(c) A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

Pa. R. Prof. Conduct 1.16.

Pennsylvania Rule of Criminal Procedure 120 imposes the following requirements regarding an attorney's entry and withdrawal of appearance:

(A) Entry of Appearance

(1) Counsel for defendant shall file an entry of appearance with the clerk of courts promptly after being retained, and serve a copy of the entry of appearance on the attorney for the Commonwealth.

. . . .

(4) An attorney who has been retained or appointed by the court shall continue such representation through direct appeal or until granted leave to withdraw by the court pursuant to paragraph (B).

(B) Withdrawal of Appearance

(1) Counsel for a defendant may not withdraw his or her appearance except by leave of court.

(2) A motion to withdraw shall be:

> (a) filed with the clerk of courts, and a copy concurrently served on the attorney   for the Commonwealth and the defendant; or
>
> (b) made orally on the record in open court in the presence of the defendant.
>
> (3) Upon granting leave to withdraw, the court shall determine whether new counsel is entering an appearance, new counsel is being appointed to represent the defendant, or the defendant is proceeding without counsel.

Pa. R. Crim. P. 120.  In *Commonwealth v. Librizzi*, 810 A.2d 692 (Pa. Super. Ct. 2002), the

Pennsylvania Superior Court

> remind[ed] and admonish[ed] counsel, both privately retained and court appointed, that, once an appearance is entered, the attorney is responsible to diligently and competently represent the client until his or her appearance is withdrawn. Rules of Professional Conduct 1.1 and 1.3. This responsibility includes filing an appeal when the client so requests. Counsel is also reminded that an appearance may be withdrawn only by leave of court. Pa.R.Crim.P. 120.

810 A.2d at 693.  *Commonwealth v. Keys*, 580 A.2d 386, 387 (Pa. Super. Ct. 1990),

stressed the importance of formal withdrawal in a case where, after sentencing but before

the time had expired for filing a notice of appeal, the petitioner's privately retained counsel

had informed the petitioner that he would no longer represent him but counsel neither

sought nor received leave of court to withdraw as counsel of record.  *Id.* at 386.

> The importance of the express requirement of formal allowance of withdrawal is well illustrated here. By informally withdrawing, counsel left appellant to seek new private counsel, assignment of court appointed counsel, or to pursue direct appeal *pro se* during the critical 30 day period during which appellant was required to perfect or waive a direct appeal. Had counsel sought allowance of the court to formally withdraw as counsel, the trial court could have taken steps necessary to prevent the procedural default which occurred in this case by

having counsel file notice of appeal before withdrawing, by assigning court
appointed counsel, or by ensuring that appellant's notice of
appeal would be effectual.

*Id.* at 387.[10]

In *Commonwealth v. Lantzy*, 736 A.2d 564 (Pa. 1999), the Pennsylvania Supreme

Court stated that "where there is an unjustified failure to file a requested direct appeal, the

conduct of counsel falls beneath the range of competence demanded of attorneys in

criminal cases, [denying] the accused the assistance of counsel guaranteed by the Sixth

Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania

Constitution, and constitutes prejudice." *Id.* at 572 (citations and footnotes omitted).

The Superior Court followed *Keys* and *Lantzy* in *Commonweatlh v. Qualls*, 785 A.2d

1007 (Pa. Super Ct. 2001), when considering counsel's failure to withdraw in the face of the

defendant's desire to file an appeal:

plea counsel has admitted he did not seek leave of court to withdraw his
representation of Appellant. Rather, plea counsel took the position that he had
fulfilled his duty to his client by informing Appellant that he could obtain
appellate counsel from the public defenders' association, and nothing more
was necessary. On this basis, plea counsel simply ceased active
representation of Appellant, disregarding the known and acknowledged fact
that his client "definitely" wanted to file an appeal. Although a matter of fees
associated with continued representation may be a legitimate ground for a
motion to withdraw as counsel, it does not empower counsel to decide
unilaterally and informally to cease representation. By withdrawing in this

---

[10] *Keys* and *Qualls* determined that the appropriate remedy for what *Qualls* termed the deprivation of "the
fundamental right of appeal" was to restore those rights *nunc pro tunc.* 785 A.2d at 1011; 580 A.2d at 387.

impermissible manner, plea counsel rendered Appellant ineffective legal assistance, resulting in *per se* prejudice to Appellant.

785 A.2d at 1011.

The Supreme Court has held that "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Roe v. Flores–Ortega,* 528 U.S. 470, 484, (2000). *Roe* explained that

> counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. [*Strickland v. Washington*, 466 U.S. 668, 690 (1984)] (focusing on the totality of the circumstances). Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. . . . Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

528 U.S. at 480.[11] The Court also noted that "courts evaluating the reasonableness of counsel's performance using the inquiry . . . described will find, in the vast majority

---

[11] The Court also held that "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Roe v. Flores-Ortega*, 528 U.S. at 484.

of cases, that counsel had a duty to consult with the defendant about an appeal." *Id.* at 481.

Specifically, Counsel's failure to perfect an appeal has been found to be "sufficiently egregious dereliction to warrant equitable tolling." *Jones v. Henry*, 460 F. App'x 717, 722 (9th Cir. 2011) (Rawlinson, J., concurring in part) (citing *Holland*, 130 S. Ct. at 2562; *Spitsyn*, 345 F.3d at 801).

Here several circumstances stood in Petitioner's way and prevented timely filing. As in *Holland's* examples of egregious conduct, Sheldon failed to perform an essential service, he failed to communicate with Petitioner, he refused Petitioner access to his files, he did not respond to correspondence, and he made misleading statements. 560 U.S. at 651 (citations omitted).

Sheldon violated numerous canons of professional responsibility which go to the extraordinary circumstance inquiry: he did not perform reasonably competent legal work in that he did not file a direct appeal which would have tolled the running of the statutory period; he did not communicate with his client that he had not filed an appeal which meant that Petitioner was not apprised of the fact that he had a limited amount of time to pursue alternate review; and he did not accommodate Petitioner's reasonable requests for information and legal materials. *See Holland*, 560 U.S. at 652-53; Pa. R. Prof. Conduct 1.1-1.4. Sheldon's lack of communication was critical because Petitioner wrote to him numerous times before the AEDPA statute of limitations ran and asked about the status of

his appeal. (Doc. 18-1 at 3 ¶¶ 8-12.) Sheldon's only response was "you should refrain from communicating directly with the courts. As your attorney of record, all questions you have concerning your case should be forwarded directly to me." (*Id.* at 11.)

Sheldon's failure to file an appeal cannot be considered anything less than egregious in that he violated the constitutional duty identified in *Roe* when he did not consult directly with Petitioner about an appeal after sentencing when he knew Petitioner wanted to file an appeal, 528 U.S. at 480; his performance was constitutionally deficient under *Lantzy*, *Qualls*, and *Keys*, 736 A.2d at 572; 785 A.2d at 1011; 580 A 2d at 387; and he violated Pennsylvania Rule of Criminal Procedure 120 and Pennsylvania Rule of Professional Conduct 1.16 when he did not continue to represent Petitioner through direct appeal and did not seek leave of court to withdraw, Pa. R. Crim. P. 120(A)(4), (B)(1)-(2); Pa. Rule Prof. Conduct 1.16(c).

By his own testimony, Sheldon understood that Petitioner wanted to file an appeal and recommended another attorney. (Doc. 22-7 at 15.) Assuming *arguendo* that Sheldon directly informed the family that he did not want to handle the appeal and recommended another attorney, his conduct nonetheless violated *Roe's* obligation to communicate *directly* with his client about the appeal, 528 U.S. at 480, and *Qualls'* prohibition against unilateral cessation of active representation, 785 A.2d at 1011. Further, *Qualls* established that any fee-related consideration was not germane to the fulfillment of counsel's obligations regarding an appeal, *id.*, so Sheldon's testimony that his representation ceased after

sentencing according to the fee agreement (Doc. 22-7 at 15 (Tr. at 23:3-6)), is of no legal significance when considering the egregiousness of his conduct.

Even if Sheldon somehow did not understand that Petitioner wanted to appeal his case, a misunderstanding which would not be supported by the record, Sheldon's testimony regarding repeated lack of recollection concerning Petitioner's desire to appeal his conviction does not account for the documented fact that he failed to take any steps to rectify his error after receiving correspondence from Pennsylvania courts and Petitioner. Rather, Sheldon's ongoing obfuscation of the status of Petitioner's case and his failure to file the appeal continued to stand in the way of Petitioner seeking alternative relief before and after the statutory period ran for both the filing of a federal habeas petition and a PCRA petition.

Finally, extraordinary circumstances continued because, as discussed above, Sheldon's misleading information communicated in his December 2010 letter to Petitioner set the stage for Petitioner to seek further representation rather than filing a *pro se* habeas or PCRA petition.

This review of the facts of this case within the relevant legal context demonstrates that extraordinary circumstances stood in Petitioner's way and there was a causal connection between the extraordinary circumstances and his failure to file a timely habeas petition. *See Ross*, 712 F.3d at 802–03. Thus, Petitioner is entitled to equitable tolling of the AEDPA statute of limitations and his § 2254 Petition will be deemed timely filed. With

this determination, the Court may proceed to consideration of the merits of the Petition.

Before doing so, the Court emphasizes that the equitable tolling determination is not based on any finding which is in opposition to Judge Lewis's June 17, 2014, Memorandum Opinion (Doc. 22-5). The Court does not disagree with the PCRA Court's finding that the May 7, 2012, Petition was not timely filed within the one-year period, that no timeliness exception was pled or proven, and that the PCRA Court was without jurisdiction to consider the merits of the Petition. (*Id.*)[12]

---

[12] The Court's determination differs from the R&R's conclusion that Petitioner did not show entitlement to equitable tolling which was based on the Magistrate Judge's analysis that the PCRA Court's decision precluded such a finding:

> While not offering an opinion based on abandonment by Risjan's trial attorney, the court found that the conduct of the attorney did not give rise to an applicable timeliness exception. This Court finds no reason to upset such a determination or to find in opposition in order for Risjan to pursue federal relief.
>
> . . . Had the Court of Common Pleas found factual support for Risjan's position that he had been abandoned, the gateway through Pennsylvania's procedural barriers would have been opened. . . . As the state court's rejection for untimeliness required an underlying factual finding on the discussions, knowledge, and conduct between Attorney Sheldon and the Risjans sufficient to reject a declaration of attorney abandonment, the Court must respect those findings, having no reason to doubt the correctness of these facts.

(Doc. 29 at 12-13.)

Whereas the Magistrate Judge's conclusion hinged on what she found to be implicit PCRA Court findings, the Court does not find the inferences warranted based on the PCRA Court's analysis, the basis upon which the Petition was denied, and the jurisdictional nature of PCRA timeliness requirements. Regarding the PCRA Court's analysis and conclusion, the Court does not read the PCRA decision to have found that Sheldon's "conduct . . . did not give rise to an applicable timeliness exception." (*Id.* at 12.) As previously discussed,

> the PCRA Court did not base its finding of untimeliness on Sheldon's testimony or make any specific finding related to it so the Court is not disturbing a PCRA Court finding. The PCRA Court reviewed very limited testimony and, at most, implied that Sheldon's testimony was stronger than Ms. Risjan's but made no explicit findings regarding the overall PCRA Hearing

testimony.  (*See* Doc. 22-5 at 5.)  Judge Lewis's determination was based *solely* on his conclusion that the PCRA Court lacked jurisdiction because the Petition was untimely and no exception to the filing requirements was pled or proven.  (Doc. 22-5 at 3-8.)  With the PCRA Court's finding of jurisdictional preclusion, the Court cannot conclude that the PCRA Court's sparse discussion of the PCRA Hearing testimony indicates an implicit finding that Sheldon's post-sentencing representation was adequate.

*See supra* pp. 42-43.  Because Attorneys Logue and Pitonyak were the attorneys responsible for failing to plead or prove a timeliness exception, contrary to the Magistrate Judge's assertion that the PCRA Court finding related to Sheldon's conduct, the finding at most reflects on PCRA counsels' performance.

Further, the Magistrate Judge's conclusion that "the gateway through Pennsylvania's procedural barriers would have been opened" if the Court of Common Pleas found "factual support for Risjan's position that he had been abandoned" (Doc. 29 at 12) implies that the  jurisdictional timing requirements of 42 Pa. C.S.A. § 9545(b)(1) and/or an applicant's failure to satisfy the requirements of an exception identified in 42 Pa. C.S.A. § 9545(b)(1)(i)-(iii) would be waived if a petitioner had shown that he had been abandoned by his attorney of record yet could not technically satisfy the requirements of an exception.  However, nothing in the PCRA Court's decision suggests the possibility of an exception to PCRA filing requirements other than those statutorily established.  Rather, the PCRA Court found to the contrary in relying on *Commonwealth v. Hall* which held that Pennsylvania courts lack jurisdiction to entertain untimely PCRA petitions and no avenue to relief for denial of appellate rights existed outside the filing of a petition under the PCRA, *Hall*, 771 A.2d at 1234-35 (Pa. 2001).  (*See* Doc. 22-5 at 6-7.)  *Lantzy* specifically identified the need for a petitioner to satisfy PCRA requirements, 736 A.2d at 572, and Pennsylvania courts which have provided relief based on attorney abandonment have done so *only where the PCRA petition was timely filed.  Lantzy*, 736 A.2d at 572; *Qualls*, 785 A.2d at 1011; *Keys*, 580 A 2d at 387.  In other words, for a petitioner to be granted the relief to which he would be entitled based on his attorney's failure to file an appeal, he would have had to raise the claim in a timely filed PCRA petition.

In the absence of the possibility of an equitable exception to the PCRA filing requirements, the Court finds no support for the Magistrate Judge's conclusion that "the gateway through Pennsylvania's procedural barriers would have been opened" if Sheldon had abandoned Petitioner.  (Doc. 29 at 12.)  The foregoing discussion demonstrates that the Court's conclusion that Petitioner is entitled to equitable tolling does not upset any explicit or implicit determination made by the PCRA Court in its June 17, 2014, Memorandum Opinion and Final Order (Doc. 22-5).

As will be discussed in the context of procedural default, the Court does not adopt all factual findings made in the second PCRA Court's decision, but they are not found in the first decision under consideration here.  Further, the Court's analysis of the jurisdictional nature of PCRA timeliness requirements for equitable tolling purposes is distinct from that undertaken later herein considering the procedural default doctrine and exceptions regarding ineffective assistance of counsel.

B.    <u>Analysis of the 28 U.S.C. § 2254 Petition</u>

As noted by the Court of Appeals for the Third Circuit, the Supreme Court has often said habeas corpus is an "'extraordinary remedy' reserved for defendants who were 'grievously wronged' by the criminal proceedings." *Dunn v. Colleran*, 247 F.3d 450, 468 (3d Cir. 2001) (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998)). The reasons for restraint exercised by federal courts in reviewing and granting habeas relief are many, including the considerations of comity and federalism. "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power and their good-faith attempts to honor constitutional law." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Also, states have a recognized interest in the finality of convictions that have survived direct review within the state court system. *Brecht v. Abrahamson*, 507 U.S. 619, 620 (1993). As stated in *Martinez v. Ryan*, 566 U.S. 1 (2012), "[f]ederal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Id.* at 9. Despite these cautions, habeas is essentially governed by equitable principles which a reviewing court is to consider in analyzing each case. *See, e.g., Holland*, 560 U.S. at 649-50.

A federal district court first considers rules regarding the state's primary opportunity to address claims of constitutional wrongdoing raised in the habeas petition. This inquiry involves the legal standards relevant to exhaustion of state court remedies and the doctrine of procedural default.

## 1. Exhaustion and Procedural Default

Absent special circumstances, the petition "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b). If an applicant has the right to raise the questions presented under any available state procedure, he shall not be deemed to have exhausted the remedies available. 28 U.S.C. § 2254(c).

To exhaust state court remedies, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review procedures."[1] *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A claim has been exhausted when it has been "fairly presented" to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). This means that the federal habeas claim "must be the substantial equivalent of that presented to the state courts." *Lambert v.*

___

[1] Pursuant to Order 218 of the Pennsylvania Supreme Court, review of criminal convictions and post-conviction relief matters from the Pennsylvania Supreme Court is discretionary and 'unavailable' for purposes of exhausting state court remedies under § 2254." Therefore, in Pennsylvania a federal claim may be exhausted by presenting it to the Superior Court of Pennsylvania, either on direct appeal from a state criminal conviction or on appeal from a PCRA court's denial of post-conviction relief. *Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004); *Sowell v. Kauffman*, Civ. No. 3:16-CV-2316, 2019 WL 254234, at *3 (M.D. Pa. Jan. 17, 2019).

*Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). Our Circuit Court has also described "fairly presented" to mean that a petitioner must have presented both the factual and legal substance of his claims in the state court's highest tribunal, *Rolan v. Coleman*, 680 F.3d 311, 317 (3d Cir. 2012). He must do so "in a manner that puts them on notice that a federal claim is being asserted." *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005). The allegations and supporting evidence must offer the state courts "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citing *Picard*, 404 U.S. at 276-77).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999). Claims deemed exhausted because of a state procedural bar are procedurally defaulted. *See, e.g., Lines v. Larkins*, 208 F.3d 153,159-60 (3d Cir. 2000) (*citing McCandless*, 172 F.3d at 260). The district court then analyzes the claims under the procedural default doctrine. *Id.; see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). Our Circuit Court has explained that

> [p]rocedural default occurs when a claim has not been fairly presented to the state courts (i.e., is unexhausted) and there are no additional state remedies available to pursue, *see Wenger v. Frank*, 266 F.3d 218, 223-24 (3d Cir. 2001); or, when an issue is properly asserted in the state system but not addressed on the merits because of an independent and adequate state rule, *see McCandless v. Vaughn*, 172 F.3d 225, 260 (3d Cir. 1999). Ordinarily, violation

of firmly established and regularly followed state rules . . . will be adequate to foreclose review of a federal claim.

*Rolan*, 680 F.3d at 317.

When a state court does not review a claim based on a state procedural rule, the procedural bar applies "only when the state rule is 'independent of the federal question [presented] and adequate to support the judgment.'" *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Nara v. Frank*, 488 F.3d 187, 199 (3d Cir. 2007) (citing *Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). The requirements of independence and adequacy are distinct. *Leyva*, 504 F.3d at 365 (citing *Johnson v. Pinchak*, 392 F.3d 551, 557-59 (3d Cir. 2004)). A rule is "independent" if it is not dependent on any federal constitutional question, but "[a] state procedural ground will not bar federal habeas relief if the state law ground is 'so interwoven with federal law' that it can not be said to be independent of the merits of a petitioner's federal claims." *Johnson*, 392 F.3d at 557. A rule is "adequate" if "'it was firmly established, readily ascertainable, and regularly followed at the time of the purported default.'" *Leyva*, 504 F.3d at 366 (quoting *Szuchon v. Lehman*, 273 F.3d 299, 327 (3d Cir. 2001)).

In *Fahy v. Horn*, 516 F.3d 169 (2008), the Third Circuit Court of Appeals cited its previous holding that § 9545(b)(1) was not firmly established or regularly applied until November 23, 1998, at the earliest. *Id.* at 189 (citations omitted). In *Walsh v. Kloptoski*, Civ. A. No. 08-5273, 2011 WL 7102569 (E.D. Pa. June 21, 2011), the District Court reviewed the history of § 9545(b)((1) and concluded it was both an adequate and

independent state procedural rule as of the relevant 2006 date in that case. *Id.* at 10-11 (citations omitted).

Here Petitioner's claims were presented in the PCRA I Petition. (*Compare* Doc. 1 at 8, *with* Doc. 22-4 at 2-8.) However, the Petition was found to be untimely under 42 Pa. C.S.A. § 9545(b) and the PCRA I Court concluded it was therefore without jurisdiction to entertain the Petition. (Doc. 22-5 at 4, 8.) Because the PCRA Court's finding of untimeliness relied on what was an adequate and independent rule at the time it was applied, *see Walsh*, 2011 WL 7102569 at *10-11, Petitioner's claims are procedurally defaulted.

Under the procedural default doctrine, a district court does not reach the merits of a defaulted claim unless the petitioner can show "cause and prejudice" or that a "fundamental miscarriage of justice" will result if the court does not consider the merits. *Coleman*, 501 U.S. at 731. As noted previously, Petitioner has not pursued his claim that that his default should be excused based on a fundamental miscarriage of justice, *see supra* n.6 (citing Doc. 29 at 1), and now focuses on the cause and prejudice basis for excusing procedural default.

Though not a model of clarity, Petitioner's counseled objections to the Report and Recommendation point primarily to *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Maples v. Thomas*, 565 U.S. 266 (2012), to support his claim that cause and prejudice exist to excuse the procedural default. (Doc. 43 at 13-15.) Under *Martinez*, Petitioner claims that the

ineffectiveness of trial and PRCA counsel caused the default; under *Maples*, he claims that counsels' conduct can be considered abandonment. (*Id.* at 14-12.)

## 2. *Excusing Procedural Default Under Martinez v. Ryan*

Petitioner claims that trial counsel was ineffective for failing to file post-trial/sentencing motions and failing to file an appeal raising numerous substantive issues (Doc. 1 at 8) and PCRA counsel was ineffective for failing to file a timely petition (Doc. 43 at 20).[13] These claims rely on the exception to procedural default established in *Martinez v. Ryan*, 566 U.S. 1 (2012), where the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, ... counsel in that proceeding was ineffective." 566 U.S. at 17.

In *Workman v. Superintendent Albion SCI*, 915 F.3d 928 (3d Cir. 2019), the Third Circuit Court of Appeals explained the application of *Martinez*.

> *Martinez* recognizes a narrow exception to the doctrine of procedural default: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." [*Martinez*, 566 U.S. at 9.] This exception is available to a petitioner who can show that: 1) his procedurally defaulted ineffective assistance of trial counsel claim has "some merit," and that 2) his state-post

---

[13] Respondents summarily conclude that Petitioner's claims are barred by procedural default in that they state only that the claims were not timely presented to the state courts in a timely fashion and only one claim (claim number 1) was presented at all, the other nine being "brand new." (Doc. 22-1 at 7-8.) Though the Court agrees claims were presented to the state court in an untimely petition, the claims numbered 2 through 10 in the instant habeas action (Doc. 1 at 8) are not "brand new" when compared with the grounds for relief set out in the initial PCRA Petition (Doc. 22-4). Their cursory argument will not be further considered in the Court's analysis of whether an excuse for procedural default exists in this case.

conviction counsel was "ineffective under the standards of *Strickland v. Washington*." [*Id.* at 14.] We explain these requirements in turn.

## 1. The Underlying Claim Must Have "Some Merit"

To excuse procedural default on an ineffective assistance of trial counsel claim under *Martinez*, that claim must be substantial—it must have "some merit." [*Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).] *Miller-El v. Cockrell*, the case on which the Supreme Court based its description of what a "substantial claim" entails, concerns the standards for issuing a certificate of appealability. To demonstrate that his claim has some merit, a petitioner must "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." [537 U.S. at 366.]

This is different from the standard applied on the merits under *Strickland v. Washington*. [466 U.S. 668.] That standard requires a petitioner to show counsel was "deficient," meaning "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." [*Id.* at 687.] A petitioner must also show that "the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." [*Id.*] This is an exacting standard, [*see Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986) (noting that *Strickland* standard is "highly demanding),] reflecting the reluctance of the courts to second-guess strategic decisions made by counsel.

## 2. State Post-Conviction Counsel Must Be Ineffective

A substantial claim alone is not sufficient to excuse a petitioner's procedural default. *Martinez* holds that state post-conviction counsel must be "ineffective under the standards of *Strickland v. Washington*" to excuse the procedural default of the underlying claim. *Martinez*, 566 U.S. at 14.

We have described *Strickland* as containing two prongs, both of which must be met to sustain a claim of ineffective assistance of counsel: the "performance" and "prejudice" prongs. [*See Bey v. Superintendent Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017)).] The "performance" prong refers to *Strickland*'s requirement that "counsel's representation fell below an

objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The "prejudice" prong refers to *Strickland*'s requirement that a petitioner show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [*Id.* at 694.]

For [the petitioner] to show that his state post-conviction counsel's deficient performance caused prejudice under *Strickland*, he must show that his state post-conviction counsel could have obtained a different result had he presented the now-defaulted ineffective-assistance-of-trial-counsel claim. In other words, he must prove the merits of his underlying ineffective-assistance-of-trial-counsel claim in order to excuse the procedural default of that claim and obtain consideration on the merits. At this stage, what is important is that the underlying ineffective-assistance-of-trial-counsel claim is "substantial," not that a petitioner has, in fact, been "prejudiced" by trial counsel's deficient performance under *Strickland*.

If the use of the word "substantial" and the phrase "some merit" rather than "prejudicial" does not make it explicit, the Supreme Court clearly implies, by relying on *Miller-El v. Cockrell* in its requirement that the claim be substantial, that the underlying ineffective-assistance-of-trial-counsel claim must be evaluated under a standard less exacting than *Strickland* prejudice. [*See Martinez*, 566 U.S. at 14; *Bey*, 856 F.3d at 238.] In *Martinez*, the Court acknowledged that an unrepresented or ineffectively represented prisoner likely cannot vindicate an ineffective-assistance-of-trial-counsel claim:

> Without the help of an adequate attorney, a prisoner will have similar difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim.... To present a claim of ineffective assistance at trial in accordance with the State's procedures, then, a prisoner likely needs an effective attorney.

> The same would be true if the State did not appoint an attorney to assist in the initial-review collateral proceeding. The prisoner, unlearned in the law, may not comply with the State's procedural

rules or may misapprehend the substantive details of federal constitutional law.... While confined to prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record.

[*Martinez*, 566 U.S. at 11-12.]

. . . .

Two other appellate courts have considered the role of *Martinez*'s "substantial" requirement and whether the underlying ineffective-assistance-of-trial-counsel claim must also be analyzed under the exacting bar of *Strickland*. In our view, and in accordance with the view shared by the Seventh and Ninth Circuits, when a petitioner shows that post-conviction relief counsel's performance was unreasonably deficient, the requirement that the deficient performance result in prejudice may be satisfied "with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted." [*Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017) (citing *Detrich v. Ryan*, 740 F.3d 1237, 1245-46 (9th Cir. 2013)).]

*Workman*, 915 F.3d at 937–39.

*Workman* also reviewed the Supreme Court's consideration of *Martinez* in *Trevino v. Thaler*, 569 U.S. 413 (2013), where the Court stated that a federal habeas court could find "cause," thereby excusing procedural default, where the following requirements are met:

"(1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law requires that an ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Workman*, 915 F.3d at 940 (quoting *Trevino*, 569 U.S. at 423).

Based on a review of relevant precedent, the Circuit Court adopted the following rule: "To demonstrate cause under *Martinez-Trevino*, the petitioner must show deficient performance by counsel on collateral review as required under the first prong of the *Strickland* analysis.... Actual resulting prejudice can be established with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted." *Workman*, 915 F.3d at 941 (quoting *Brown*, 847 F.3d at 513). The Third Circuit called the rule "sensible, workable, and a proper reading of *Martinez*." *Id.* In practical terms, it meant that if the petitioner "shows that his underlying ineffective-assistance-of-trial-counsel claim has some merit and that his state post-conviction counsel's performance fell below an objective standard of reasonableness, he has shown sufficient prejudice from counsel's ineffective assistance that his procedural default must be excused under *Martinez*." *Id.* (citing *Preston v. Superintendent of Graterford SCI*, 902 F.3d 365, 376 (3d Cir. 2018)).

a.     **Merits of Underlying Claim**

As a threshold matter, the Court will consider whether "the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim." *Trevino*, 569 U.S. at 423; *Workman*, 915 F.3d at 940. As set out above, a claim is substantial if it has "some merit," a standard which requires a petitioner to "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that

the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 366.

Before proceeding with the application of this standard to the case at bar, an important caveat is that the *Martinez* exception can be invoked only to show cause for the procedural default of claims of ineffective assistance of *trial* counsel. As discussed in *Richardson v. Superintendent Coal Township SCI*, 905 F.3d 750 (3d Cir. 2018), in the context of claims involving post-sentencing issues, the reviewing court must consider whether counsel was acting as trial counsel rather than appellate counsel in that claims of ineffectiveness of appellate counsel are not subject to the *Martinez* exception. *Id.* at 760-61. *Richardson* explained that *Martinez* limited its equitable exception to prisoners challenging the ineffectiveness of their trial counsel, *id.* at 760 (citing *Martinez*, 566 U.S. at 17), and the Supreme Court later declined to extend *Martinez*'s exception to claims of ineffective assistance of appellate counsel, *id.* (citing *Davila v. Davis*, ---U.S.---, 137 S. Ct. 2058, 2065 (2017)).

*Richardson* thus identified the initial question in the analysis to be "whether post-sentencing counsel counts as trial or appellate counsel under *Martinez*." 905 F.3d at 761. To answer this question, *Richardson* considered where the line should be drawn between trial and appellate counsel and held that "the boundary between trial and appellate counsel falls at the effective date of the notice of appeal." 905 F.3d at 761-62.

Here Sheldon never became appellate counsel because he never filed a notice of appeal and did not withdraw from the case. Therefore, *Martinez's* equitable exception did not end.

*Richardson* also held that "in Pennsylvania state court, the post-sentencing-motions stage is a critical stage at which a defendant is entitled to the effective assistance of counsel." 905 F.3d at 756, 764-66. As discussed in the context of equitable tolling, here Sheldon did not function as counsel during this critical stage when he was ethically and legally bound to do so. Also as discussed previously, Sheldon has stated that he had no communication with Petitioner after sentencing although he acknowledges that he knew his continued services were requested. This scenario leaves no doubt that Petitioner's claims of ineffectiveness of trial counsel are substantial.

b.     Ineffectiveness of PCRA Counsel

The procedural labyrinth of this layered ineffective assistance of counsel claim is complicated by Petitioner's journey through the PCRA process. As set out in the Factual Background section of this Memorandum Opinion, Petitioner's first PCRA was filed more than one year after Attorneys Logue and Pitonyak were hired to do so. They were paid $30,000 for their services, and, according to Petitioner's affidavit, they represented that they would file the petition within sixty days of when Petitioner learned that Sheldon had not filed an appeal and further represented that they had filed a PCRA petition within that time frame. (Doc. 18-1 at 5 ¶ 21.) In contrast, after Petitioner filed his *pro se* ineffective assistance of

66

PCRA counsel claim in a second petition, the PCRA II Court adopted the argument proffered by Petitioner's appointed PCRA II counsel, Jennifer Tobias, that Attorneys Logue and Pitonyak could not have been ineffective for failing to plead or prove an exception to the timeliness requirements of 42 Pa. C.S.A. § 9545(b) because they were hired after the sixty (60) day period could have been invoked.[14] (*See* Doc. 22-10 at 6-7 & n.11.) Specifically, the PCRA II Court reasoned as follows in its June 24, 2016, Memorandum Order:

> the Defendant did not even retain PCRA Counsel until after the 60-day requirement expired *on his first PCRA Petition.* The Defendant admitted he contacted the Superior Court in September 2010, to question the status of his appeal. A that point in time, any PCRA Petition would have been untimely, as the Defendant had until July 29, 2010 to file a timely PCRA Petition. To invoke an exception, a Defendant must include a precise date when he learned of the after-discovered evidence to allow the court to determine whether the exception has been timely invoked, as required under *Commonwealth v. Beasley*, 741 A.2d 1258, 1261-61 (Pa. 1999). The Defendant has not included a precise date. However, assuming arguendo, that we used the month of January, 2011 as the date the defendant knew Attorney Sheldon (trial counsel) was not filing an appeal, the 60-day requirement would end in March 2011.[15] The Defendant acknowledges that he attempted to retain an attorney from January through March of 2011, but failed.[16] In April, 2011, the Defendant asked his grandmother to find an attorney to take over his case, and PCRA counsel were retained in May, 2011. This time period exceeds the 60-day requirement needed to invoke a timeliness exception for PCRA review, through

---

[14] The time period for filing an exception to the one-year time period in § 9545(b)(1) is found in § 9545(b)(2). At the relevant time, sixty (60) days was the prescribed filing limit. Effective December 24, 2018, the section was amended and now states that "[a]ny petition invoking an exception provided in paragraph (1) shall be filed within one year of the day the claim could have been presented." 42 Pa. C.S.A. § 9545(b)(2).

[15] In support of the January 2011 date, the PCRA II Court cited the Transcript of Proceedings, PCRA Hearing, April 19, 2013, page 15. (Doc. 22-10 at 6 n.12.)

[16] The PCRA II Court cites "Petitioner's *Declaration of Petitioner*, paragraph 17 (attached as Exhibit "A" to second PCRA Petition)." (Doc. 22-10 at 6 n.13.)

> no fault of initial PCRA counsel. Therefore, PCRA counsel cannot be found
> ineffective for failing to include a timeliness exception in the PCRA Petition.

(Doc. 22-10 at 6-7.)

Before discussing the deference due the PCRA II Court's findings, the Court notes some general observations. First, neither Tobias nor the PCRA II Court referenced the context in which Petitioner *approximated* the time when he learned Sheldon did not file an appeal and a review of the PCRA Hearing transcript shows it was clearly a broad approximation. (*See* Doc. 22-7 at 13 (Tr. at 14:12-15:9).) Before identifying "late 2010, early 2011" as the time when he learned no appeal had been filed, Petitioner twice specifically stated that he did not know when he learned the information but he thought he had learned it from his grandmother. (*Id.*) As previously discussed, nothing in Sheldon's December 2010 letter apprised Petitioner that no appeal had been filed; on the contrary, the letter indicated his case was ongoing, an indication which Sheldon's previous correspondence and court correspondence supported. *See supra* pp. 38-39 (citing Doc. 18-1 at 9, 11, 13, 15). Thus, nothing discounts Petitioner's assertion of a later date (*see, e.g,* Doc. 18 at 24; Doc. 18-1 ¶¶ 19, 21) other than his own *approximation* offered at the PCRA Hearing.

Second, it appears that the "Declaration of Petitioner" to which the PCRA II Court cited is the same or similar to the Declaration of Petitioner, Shane David Risjan (Doc. 18-1 at 2-7) dated May 21, 2015, (*id.* at 7) which Petitioner submitted in support of his supplemental filing in this Court (Doc. 18), in that the content of the paragraphs coincides

(*compare* Doc. 22-10 at 6 n.13, *with* Doc. 18-1 4 ¶ 17) and all citations to paragraphs contained in Exhibit B attached to Tobias's Motion to Withdraw Under the Post Conviction Relief Act similarly coincide (*compare* Doc. 22-9 at 13, *with* Doc. 18-1). Thus, the Court presumes Tobias knew that Petitioner had stated that "[i]n May, 2011, upon learning from my grandmother that Attorney Sheldon failed to file an appeal on my behalf, I authorized my grandmother to retain the services of private counsel, Anthony Logue and James Pitonyak" (Doc. 18-1 at 5 ¶ 19), yet this was not mentioned in her PCRA II filing.

Third, the Court finds the PCRA II Court's reliance on Tobias's argument troubling insofar as Tobias does not appear to have reviewed the record in a light favorable to her client. Tobias recognized Petitioner's assertion that Logue and Pitonyak "informed him that his PCRA Petition 'would and had been filed within 60 days of my learning that Attorney Sheldon had failed to file a requested direct appeal on my behalf'" (Doc. 22-9 at 13 (quoting Ex. B, ¶ 21)), but she disagrees with the allegation based only on her establishment of January 2011 as the definitive time when Petitioner learned Sheldon had not filed an appeal (*id.*). As discussed above, she did not cite or present evidence that Petitioner's PCRA Hearing testimony was an approximation and inconclusive given other evidence contained in the record. That is not to say that evidence presented demonstrates a clear timeline of who did what when. However, the Court would expect that Petitioner's counsel at least would have discussed the later date Petitioner identified in his Declaration and provide reasons for discounting it before adopting a dispositive date unfavorable to her client.

Further, Tobias's failure to consider the record as a whole before establishing a definitive date as the latest Petitioner could have learned Sheldon did not file an appeal does not acknowledge that Sheldon's correspondence misled Petitioner and that Sheldon himself, who continued as attorney of record until August 2011, NEVER informed Petitioner that no appeal had been filed.

Tobias's perspective becomes more troubling when the Court considers her assessment of Sheldon's performance which she analyzed before addressing the ineffectiveness of PCRA counsel. Tobias asserted that Sheldon "was not ineffective for failing to file an appeal on behalf of Defendant" based on her review of the PCRA Hearing testimony. (Doc. 22-9 at 12.) She specifically stated the following:

> It appears that Attorney Sheldon informed the defendant and his family that he was not going to file an appeal, and actually referenced another attorney to handle the appeal. Ms. Risjan wrote a letter to Attorney Sheldon questioning why he didn't want to work on an appeal, and did not contact him again until a year after the sentencing.

(*Id.*) On the basis of this analysis, Tobias stated that "even if the first PCRA had been timely filed, the claim of ineffectiveness of trial counsel had no merit and would not have warranted relief." (*Id.*)

Although this portion of her argument was not discussed by the PCRA II Court, it reflects an inexplicable bias against her client. The summary she provided in her PCRA II filing does not reflect a fair reading of the record which contains abundant testimony that Sheldon was contacted by Petitioner and his grandmother on numerous occasions. *See*

*supra* pp. 5, 9-11. Further, Ms. Tobias does not reference Petitioner's documented

correspondence with Sheldon, the Pennsylvania Courts' communications with him, or

Sheldon's own correspondence with Petitioner. *See supra* pp. 12-14. Taken alone, this

evidence supports a finding of extreme dereliction of duty toward his client where Sheldon

remained the attorney of record and did not, by his own admission, reiterate an

unwillingness to continue to represent his client after the sentencing and expressed a

remarkable lack of memory about anything from that time period except his single post-

verdict assertion. When the evidence is viewed in the context of Sheldon's obligations

under the Pennsylvania Rules of Professional Conduct, Pennsylvania Rules of Criminal

Procedure, Pennsylvania state law, and Supreme Court precedent, *see supra* pp. 44-49,

Tobias's conclusion that one comment made by Sheldon following the verdict supports a

finding of effectiveness is baffling and deficient.

Despite these observations, the Court is cognizant of the demands of § 2254(e)(1)

that a federal court is required to presume that a state court's findings of fact are correct.

As stated in *Washington v. Sobina*, 509 F.3d 613 (3d Cir. 2007),

> Under the statutory standards governing the granting of habeas relief, a state
> court's factual findings must be rebutted by clear and convincing
> evidence. *See Lambert v. Blackwell,* 387 F.3d 210, 234 (3d Cir.2004) (citing 28
> U.S.C. § 2254(e)(1)). Deference accorded a state court's determination of fact
> is not limitless, and "does not by definition preclude relief," *Miller–El v.
> Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003);
> nevertheless, the burden is on the habeas petitioner to rebut the presumption
> of correctness by clear and convincing evidence. It is not enough to decide that
> the petitioner has advanced a plausible alternative to the factual findings of the

state court. *See Martini v. Hendricks,* 348 F.3d 360, 368 (3d Cir.2003). *Washington,* 509 F.3d 613, 621 (3d Cir. 2007); *see also Suarez v. Kerestes,* Civ. A. No. 3:13-CV-2004, 2016 WL 6693083, at *2 (M.D. Pa. Nov. 14, 2016). *Washington* also cited *Weeks v. Snyder,* 219 F.3d 245, 250 (3d Cir. 2000), for the proposition that § 2254(e)'s highly deferential presumption of correctness is due a state court's implicit factual findings. *Id.*

The Court assumes the correctness of the determination that the first PCRA Petition was not timely filed based on the Court's finding that July 29, 2010, was the deadline for a timely filing and PCRA counsel did not plead or prove an exception to the filing requirements set out in 42 U.S.C.A. § 9545(b)(1) in the Petition filed on May 7, 2012. (Doc. 22-5 at 4.) The PCRA I Court did not make any further explicit or implicit findings as to the exceptions set out in § 9545(b)(1)(i)-(iii).[17] (*See* Doc. 22-5 at 1-8.) However, for the reasons discussed below, the Court concludes that § 2254(e)(1) deference is not due the PCRA II Court's factual finding that a § 9545(b)(1) exception could not be invoked after March 2011 because Petitioner learned of trial counsel's failure to file an appeal no later than January 2011. (*See* Doc. 22-10 at 6.)

Petitioner, filing *pro se,* introduced evidence that rebuts the PCRA Court's March 2011 filing deadline which formed the basis of the finding that PCRA I counsel could not

---

[17] *See supra* n.9.

have been ineffective.  Specifically, evidence submitted supports the conclusion that Petitioner learned later in the Spring of 2011 that Sheldon had not filed an appeal.  (Doc. 18-1 at 5 ¶¶ 19-21.)   Although the supporting assertions are found in Petitioner's own declaration, they are of similar character to his approximation of the date stated at the PCRA Hearing which Tobias proffered as the basis for the establishment of the March 2011 deadline upon which she and the PRCA II Court relied.

Further, the assertions contained in Petitioner's Declaration are convincing when viewed in the context of the Fee Agreement signed by Attorneys Logue and Pitonyak on May 2, 2011, and inferences appropriately derived therefrom.  Attorneys Logue and Pitonyak contracted on May 2, 2011, to represent Petitioner with respect to "Criminal Appeal for Shane David Risjan" and entered into a Fee Agreement where Clara Risjan agreed to pay them a non-refundable retainer of $30,000.[18]  (Doc. 18-1 at 17.)

Certain presumptions flow from the attorneys' accepting the representation and entering into the May 7, 2011, Agreement.  It is to be assumed that attorneys do not act unethically or criminally and they are presumed to be competent.  *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986) (there is a "strong presumption of attorney competence mandated by *Strickland*").  Similarly, attorneys are assumed to be familiar with the law in the area of representation they have undertaken in that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined

---

[18] Ms. Risjan paid $20,000 on May 2, 2011 and $10,000 on August 15, 2011.  (Doc. 18-1 at 19, 21.)

with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (citing *Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Kimmelman*, 477 U.S. at 385). Pennsylvania's Rules of Professional Conduct require "competent representation" which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Pa. R. Prof. Conduct 1.1. The rules also require that a lawyer only bring meritorious claims and contentions: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . which includes a good faith argument for an extension, modification or reversal of existing law." Pa. R. Prof. Conduct 3.1. As relevant to this inquiry, it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct" or "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Pa. R. Prof. Conduct 8.4(a), (d).

Based on these legal principles, the Court finds the May 2, 2011, Agreement indicative of PCRA counsel's belief that a petition could be filed based on a timeliness exception in that attorneys acting ethically and competently would not take a $30,000 non-refundable retainer to pursue a claim unless they believed it to have substantive merit and the possibility of success. This means they would have concluded that time remained on the sixty-day § 9545(b)(2) period at the time they entered into the Agreement and accepted the fee. Thus, the required presumptions and the attorneys' professional obligation to act

ethically and competently supports the timeline set out in Petitioner's Declaration where he avers that he learned of Sheldon's failure to file a direct appeal later in the Spring of 2011 and that the attorneys represented that the petition would be filed within sixty days of Petitioner learning that trial counsel had failed to file a direct appeal.[19]  (Doc. 18-1 ¶¶ 20-21.)

With this determination, the Court concludes that Petitioner has presented clear and convincing evidence which rebuts the presumption of correctness of the PCRA II Court's factual finding that Petitioner learned of Sheldon's failure to file an appeal at the latest in January 2011 and that no timeliness exception could be invoked past March 2011.  (Doc. 22-10 at 6.)   In turn, the PCRA II Court's factual finding that Attorneys Logue and Pitonyak could not be ineffective because they were not hired until May 2011 is not entitled to § 2254(e)(1)'s presumption of correctness.

On the issue of whether Attorneys Logue and Pitonyak provided effective assistance of counsel, the acceptance of Petitioner's timeline means that the filing of a timeliness exception was not categorically precluded at the time they were retained in May 2011.

To demonstrate cause under *Martinez-Trevino*, a petitioner must show deficient performance by counsel on collateral review as required under the first prong of

---

[19] Although Logue and Pitonyak later violated Rules of Professional Conduct requiring competency, diligence, and bringing a claim that was not frivolous, Pa. R. Prof. Conduct 1.1, 1.3, 3.1, when they waited over a year to file a PCRA petition that would be jurisdictionally barred, and they engaged in professional misconduct when they misrepresented to Petitioner that a PCRA petition had been timely filed (see Doc. 18-1 at 5 ¶ 21) , no evidence shows that they began their representation in violation of the Rules.

the *Strickland* analysis, i.e., that counsel's representation fell below an objective standard of reasonableness. *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 376 (3d Cir. 2018). As set out above, "when a petitioner shows that post-conviction relief counsel's performance was unreasonably deficient, the requirement that the deficient performance result in prejudice may be satisfied with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted." *Workman*, 915 F.3d at 939 (internal quotation and citation omitted).

The Court finds that PCRA counsel's performance was objectively unreasonable. As discussed above, Attorneys Logue and Pitonyak were expected to know the law regarding the filing of a PCRA petition and they should have known that Petitioner had until July 29, 2010, to file his petition under the one-year time for filing set out in Pa. C.S.A. § 9545(b)(1). They also were expected to know that, because the one-year deadline had long passed when they were retained in May 2011, they had a very limited amount of time to file a petition in which to plead and prove an exception to the time bar. Yet, Attorneys Logue and Pitonyak accepted $30,000 from Petitioner's grandmother to pursue Petitioner's rights but did nothing for over a year after they were retained on May 2, 2011. (Doc. 18-1 at 17-21.) By the time they got around to filing the PCRA Petition on May 7, 2012, the sixty-day time for invoking an exception to the time bar had long since passed. Attorneys Logue and Pitonyak were expected to know that the time limitations set out in § 9545(b) are jurisdictional, *Fahy*, 737 A.2d at 217, and that "when a PCRA petition is not filed within one

year of the expiration of direct review, or not eligible for one of the three limited exceptions, or entitled to one of the exceptions, but not filed within 60 days of the date that the claim could have been first brought, the trial court has no power to address the substantive merits of a petitioner's PCRA claims," *Commonwealth v. Gamboa-Taylor*, 753 A.2d 780, 783 (Pa. 2000). Thus, the representation of Attorneys Logue and Pitonyak fell below an objective standard of reasonableness when they did not file a petition within the time which would allow the PCRA Court to address the merits of Petitioner's claims.

Having found the performance of Attorneys Logue and Pitonyak deficient under the first prong of *Strickland* and having found Petitioner's claim of ineffective assistance of trial counsel substantial, the prejudice prong of the *Strickland* analysis is satisfied. *See Workman*, 915 F.3d at 939. Thus, the performance of Logue and Pitonyak constituted ineffective assistance of counsel. This determination shows that the "cause" for the procedural default "consisted of there being . . . only 'ineffective' counsel during the state collateral review proceeding." *Trevino*, 569 U.S. at 423.

Regarding the last third element of a *Martinez* claim identified in *Trevino*, there is no dispute that the state collateral review proceeding in which Attorneys Logue and Pitonyak represented Petitioner was "the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim.'" *Workman*, 915 F.3d at 940 (quoting *Trevino*, 569 U.S. at 423). Finally, the Third Circuit has upheld the application of Martinez to the Pennsylvania criminal procedure system. *Cox v. Horn*, 757 F.3d 113, 124 n.8 (3d Cir. 2014).

With the determination that Petitioner's procedural default is excused under *Martinez*, the Court may review the merits of the claims presented.  566 U.S. at 17 ("A finding of cause and prejudice does not entitle the prisoner to habeas relief.  It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.")  In this case the Court will not review the substantive merits of Petitioner's claims beyond finding that the egregiousness of Sheldon's conduct reviewed above, *see supra* pp. 48-50, makes it abundantly clear that his failure to file a direct appeal fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  The record is also clear that Petitioner wanted to appeal his conviction and he expressed that desire to Sheldon.  *See supra* pp. 5, 11-12, 48-50.  Sheldon's deficient performance combined with Petitioner's expressed desire to file an appeal constitutes ineffective assistance of counsel pursuant to *Roe*: "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." 528 U.S. at 484.  As set out in *Ross*, "[t]he defendant has the right to take this appeal because the 'denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right . . .  demands a presumption of prejudice. Put simply, we cannot accord any 'presumption of reliability' to judicial proceedings that never took place.'"  *Ross*, 712 F.3d at 798 (quoting *Roe*, 528 U.S. at 483).

Thus, Petitioner is entitled to have his appeal rights reinstated. Reinstatement of appellate rights *nunc pro tunc* is the remedy approved by the Supreme Court, *Roe*, 528 U.S. at 484, the Third Circuit Court of Appeals, *Ross*, 712 F.3d at 798, 804, and appellate courts in Pennsylvania, *Lantzy*, 736 A.2d at 572; *Qualls*, 785 A.2d at 1011; *Keys*, 580 A 2d at 387. *See supra* nn.10, 11. Because *Ross* instructed the District Court to modify its order reinstating Petitioner's appellate rights *nunc pro tunc* and, instead, order that Petitioner be released within ninety (90) days unless the Commonwealth of Pennsylvania reinstates his appeal, *id.* at 804, this Court will so order.

3.    *Excusing Procedural Default Under Maples v. Thomas*

With the conclusion that Petitioner is entitled to limited relief under *Martinez*, the Court will not engage in a full analysis of his right to relief under *Maples v. Thomas*, 566 U.S. 266 (2012), where the Court held that attorney abandonment could provide cause for procedural default. In *Maples*, the Supreme Court found that a defendant had been "abandoned by counsel [when he] was left unrepresented at a critical time for his state postconviction petition, and he lacked a clue of any need to protect himself." *Id.* at 272. Here Petitioner was essentially left unrepresented at a critical time for filing a timely PCRA petition in July 2010 and he lacked a clue that he had any need to protect himself because, at the time, he believed Sheldon had filed an appeal. As discussed at length above, Sheldon was doing nothing on Petitioner's behalf yet he did not apprise him of that fact in his correspondence to Petition dated February 8, 2010, which was in response to two letters

from Petitoner regarding the status of his case (Doc. 18-1 at 11) at which time a forthright response would have allowed Petitioner time to file a PCRA petition within the time allowed under § 9545(b)(1). However, a critical difference between this case and *Maples* is that counsel who abandoned the petitioner in *Maples* was postconviction counsel where Sheldon was trial counsel. Here Sheldon's abandonment foreclosed direct appeal but the question presented in *Maples* and relevant to procedural default was abandonment of post-conviction counsel. Although Sheldon's abandonment stood in the way of Petitioner filing a PCRA petition by the expiration of the one-year deadline of July 29, 2010, state court review was still available to Petitioner under an exception to the one-year filing requirement.[20] Thus, while Sheldon's performance is consistent with a finding of abandonment for direct appeal purposes, it is not indicative of abandonment at the postconviction proceeding level and does not provide cause for excusing procedural default under *Maples*. In other words, while Sheldon set the scene for Petitioner's ultimate failure to timely file a petition under an allowed exception, his abandonment was not the direct cause of complete foreclosure of state court review.

Regarding abandonment by PCRA counsel, the Court's conclusion that ineffective assistance of Attorneys Logue and Pitonyak caused the default of Petitioner's claims because a petition invoking an exception was not filed within the 60-day time allowed by

---

[20] After the July 29, 2010, deadline expired, Petitioner had the opportunity to raise his claims in state court when he discovered that Sheldon had not filed an appeal under § 9545(b)(1)(ii) by filing a PCRA petition within sixty days of the discovery pursuant to § 9545(b)(2).

statute does not equate with a finding of abandonment. Although the Court has found their performance deficient, Petitioner was not left unrepresented at a critical time but, rather, his representation was inadequate. *See, e.g., Young v. Westbrook*, 702 F. App'x 255, 261-66 (3d Cir. 2017) (not precedential). Therefore, *Maples* does not provide an alternative basis to find Petitioner's procedural default excused.

## VI. CONCLUSION

While no authority has granted equitable tolling in facts identical to this case or applied § 2254(e)(1)'s standard in the precise manner applied here, the foregoing findings are informed by recognition that habeas corpus is governed by equitable principles, *Duckworth v. Eagan*, 492 U.S. 195, 213 (1989) (O'Connor, J., concurring), and "fundamental fairness [remains] the central concern of the writ of habeas corpus," *Maples*, 566 U.S. at 289 (quoting *Dretke v. Haley*, 541 U.S. 386, 393 (2004)).

As discussed above, Petitioner's trial attorney egregiously and actively misled Petitioner in such a manner that, although no appeal had been filed, he could have reasonably believed approximately a year and a half after his sentencing that, in fact, there had been post-sentencing activity in his case, he could retain new counsel "if" that's how he wanted to proceed, and, if so, his counsel of record would arrange for retrieval of Petitioner's file with new counsel. Petitioner and his grandmother had experienced ongoing difficulties communicating with counsel of record and had not received information sought from him. Petitioner was understandably uncertain about the precise status of his case and

decided to seek new counsel, the only route presented to him to procure his legal documents. Petitioner immediately began the search for new counsel and, less than five months after receiving counsel of record's ambiguous letter, Petitioner's grandmother found attorneys to take the case. She paid $30,000 to new counsel who did not take any step to pursue Petitioner's claims/rights for over one year thereafter. Petitioner then proceeded *pro se* and eventually filed a second PCRA petition asserting a claim of ineffectiveness of former PCRA counsel. The attorney appointed to represent Petitioner after the second petition was filed moved to withdraw after construing the record in the light least favorable to her client.

Petitioner's core claim that he was denied effective assistance of counsel because his trial counsel did not file the appeal desired and expected presents a deprivation of fundamental fairness as well as his right under the Sixth Amendment to reasonably effective legal assistance in filing a requested appeal as articulated in *Roe v. Flores-Ortega* and all Pennsylvania appellate courts which have considered similar situations, *Lantzy*, 736 A.2d at 572; *Qualls*, 785 A.2d at 1011; *Keys*, 580 A 2d at 387. Further, in the circumstances of this case, *Roe* imposed a clear duty on trial counsel to consult with Petitioner about his appeal.

The Court concludes that the unique circumstances presented here warrant the consideration received based on the importance of competent counsel during the critical post-sentencing phase and the guidance provided in *Holland* regarding equitable habeas principles:

> we have . . . made clear that often the exercise of a court's equity powers ...
> must be made on a case-by-case basis.  In emphasizing the need for flexibility,
> for avoiding mechanical rules,  we have followed a tradition in which courts of
> equity have sought to relieve hardships which, from time to time, arise from a
> hard and fast adherence to more absolute legal rules, which, if strictly applied,
> threaten the evils of archaic rigidity.  The flexibility inherent in equitable
> procedure enables courts to meet new situations that demand equitable
> intervention, and to accord all the relief necessary to correct particular
> injustices.

*Holland*, 560 U.S. at 649–50 (internal citations and quotations omitted).

The Court also notes that the Court's decision does not infringe on the important concerns of comity and federalism set out above.  *See supra* p. 53.  The limited relief found appropriate, restoration of appellate rights, does not infringe on the Commonwealth's "primary authority for defining and enforcing the criminal law," *Engle*, 456 U.S. at 128, as it will be up to state courts to consider the substantive merits of Petitioner's claims.  Also, the Commonwealth's recognized interest in the finality of convictions that have survived direct review within the state court system, *Brecht*, 507 U.S. at 620, is not infringed because there has been no direct review in this case.  Finally, the concern expressed in *Martinez* of according state-court judgments the "finality and respect necessary to preserve the integrity of legal proceedings," 566 U.S. at 9, is minimally present in light of the following: the Petitioner's attorney did not file the requested appeal; the state's highest court recognizes the importance of a direct appeal and an attorney's incompetence in his unjustified failure to file a requested appeal, *Lantzy*, 736 A.2d at 752; the United States Supreme Court and all Pennsylvania appellate courts addressing the situation concur on the need for the remedy

of reinstating appellate rights, *Roe*, 528 U.S. at 484; *Lantzy*, 736 A.2d at 572; *Qualls*, 785 A.2d at 1011; *Keys*, 580 A 2d at 387; and the state's Rules of Criminal Procedure in very specific terms require the representation which trial counsel denied here, Pa. R. Crim. P. 120.

Because the Court has determined that equitable tolling is warranted based on the conclusions that Petitioner exercised due diligence in pursuing his rights, *see supra* p. 41, and extraordinary circumstances stood in his way of timely filing a habeas petition, *see supra* p. 52-53, equitable tolling will be granted. Because the Court has found that the performance of Attorneys Logue and Pitonyak provided cause for the procedural default and the performance of Attorney Sheldon constituted ineffective assistance of counsel, *see supra* pp. 77-78, Petitioner's 28 U.S.C. § 2254 Petition (Doc. 1) will be granted to the limited extent described herein, i.e., the Commonwealth of Pennsylvania will be directed to release Petitioner within ninety (90) days unless the Commonwealth reinstates Petitioner's appeal rights *nunc pro tunc*. With this determination, the R&R (Doc. 29) will not be adopted. An appropriate Order will be filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge